[Cite as *In re T.N.*, 2022-Ohio-2784.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: T.N., | : | No. 21AP-429 |
| [S.N. a.k.a. S.J., | : | (C.P.C. No. 16JU-5642) |
| Appellant]. | : | (ACCELERATED CALENDAR) |
| In the Matter of: Gm.J., | : | No. 21AP-430 |
| [S.N. a.k.a. S.J., | : | (C.P.C. No. 16JU-5643) |
| Appellant]. | : | (ACCELERATED CALENDAR) |

D E C I S I O N

Rendered on August 11, 2022

**On brief**: *William T. Cramer*, for appellant, S.N. a.k.a. S.J.

**On brief:** *Erik L. Smith,* for the children, T.N., Gm.J., and Gi.J.

**On brief:** *Robert J. McClaren*, for appellee, Franklin County Children Services.

APPEALS from the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch

MENTEL, J.

{¶ 1} Appellant, S.N. a.k.a. S.J., appeals from the August 6, 2021, decision and judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch, terminating her parental rights and granting permanent custody of minor children, T.N., Gm.J., and Gi.J. ("children") to appellee, Franklin County Children Services ("FCCS").

{¶ 2} For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 3}   Appellant is the biological mother of the children.  R.R. is the father of T.N. and G.J. is the father of Gm.J., and Gi.J.  On May 3, 2016, FCCS filed complaints against appellant for neglect and dependency of the children.   According to the complaint, appellant was engaging in the use of opiates without a prescription as well as allegations of domestic abuse between appellant and G.J.  The complaint further alleged that appellant was uncooperative with urine screens, missed home visits with the case workers, and missed visits with the nurse.  On May 5, 2016, the trial court granted FCCS temporary custody of the children.  An adjudicatory hearing was held on July 27, 2016.  None of the parents appeared in court.  The trial court adjudicated the children as neglected and dependent and ordered them into the temporary custody of FCCS.  The trial court approved and adopted the proposed case plan.

{¶ 4}   On January 9, 2017, FCCS filed motions requesting permanent custody of the children.  On May 4, 2017, FCCS filed a motion requesting to amend the motions for permanent custody to a motion to extend temporary custody and commitment.  The trial court granted the motion and extended the temporary custody order for six months.  On June 27, 2017, FCCS filed a motion for a second extension of temporary custody and for case plan amendment, which was also granted.  On December 29, 2017, FCCS filed motions requesting permanent custody of the children.  After a series of continuances, the case was heard on May 26 and May 27, 2021.  The following evidence was adduced at the trial.

{¶ 5}   As an initial matter, the juvenile court stated on the record that appellant was not present in the courtroom.[1]  The juvenile court also noted that the fathers of the children, R.R. and G.J. were not present.  (May 26, 2021 Tr. at 7-8.)  R.R. is the father of T.N. and is currently incarcerated.  G.J. is the father of Gm.J. and Gi.J.  The trial court noted that while G.J. had been released from prison, he had not participated in the case plan or in these proceedings.  (Tr. at 8.)  Counsel for appellant requested a continuance stating that his client had car trouble.  (Tr. at 17.)  The trial court denied the motion reasoning that given the length of time the motion has been pending, as well as the age of the case, continuing

---

[1] Appellant did appear for the second day of trial. (May 27, 2021 Tr. at 4.)

the trial would not be in the children's best interest. (Tr. at 23.) The parties proceeded with opening statements.

{¶ 6} Cassandra McKay has been an ongoing child welfare caseworker with the FCCS since February 2017. McKay testified as to her educational background and stated she is up to date on her continuing education obligations as required to serve as a caseworker. (Tr. at 36-37.) According to McKay, she has been the caseworker in this matter since September 2017 without interruption. McKay testified that she became involved in this case out of concerns originally involving domestic violence in the home where the children resided. Appellant had a fracture to her left eye and was hospitalized during her first trimester with Gi.J. (Tr. at 37.) Appellant was also struggling with substance abuse involving Percocets and tramadol. (Tr. at 38.) McKay testified that T.N. is ten years old. Gm.J. is seven years old, and Gi.J. is five years old. According to McKay, Gi.J. was born positive for drugs. The children were adjudicated neglected and dependent and FCCS was given temporary custody. According to McKay, FCCS has retained custody of the children consistently since the temporary custody order went into effect.

{¶ 7} McKay testified that the children were initially placed in a kinship placement with their paternal aunt and paternal grandmother. The placement was disrupted as the children were not properly supervised. According to McKay, appellant had taken the children out of the home unsupervised on multiple occasions. (Tr. at 41.) McKay testified that FCCS tried to sustain the placement, but it was unsuccessful. The children were then placed in a foster home where they are still located. (Tr. at 42.) McKay stated that there was a case plan made by order of the court.[2] McKay testified that she reviewed the case plan with appellant on multiple occasions. (Tr. at 51.) McKay testified that appellant's case plan entailed providing "random urine screens at the time through American Court Services, to complete a domestic violence assessment, to establish and maintain employment and housing." (Tr. at 51.) McKay also testified that appellant was required to seek an AOD assessment and follow recommendations, sign releases, provide basic needs

---

[2] We note that while G.J. and R.R. did not file an appeal in this matter, McKay testified extensively as to their case plans. R.R. is expected to be released from prison in 2027. As for G.J., McKay stated that he was released in August 2020 and has not been engaged in the case plan. G.J. has been difficult to locate since his release. McKay also noted that G.J. did not complete a batterer's intervention course as required. (Tr. at 48.)

for children, and meet with McKay on a regular basis. (Tr. at 52-53.) According to McKay, appellant understood what she was required to complete in the case plan.

{¶ 8} McKay testified as to appellant's housing stating she has had "various addresses that were actually between Columbus, Ohio and Springfield, Ohio. So it was hard to detect where she might have been staying. I've had at least five addresses since -- for mother since 2017." (Tr. at 53-54.) McKay stated that she was able to walk through only two of the five addresses. (Tr. at 54-55.) Appellant had also stayed with friends and family before obtaining independent housing in February 2020. (Tr. at 54.) McKay described the residence as a three-bedroom apartment. McKay stated that the residence is now fully furnished with beds for all three children. (Tr. at 57-58.) McKay indicated that it appeared the maternal grandmother was staying in the residence during the home visit. (Tr. at 58-59.) Appellant has a Section VIII voucher and receives a check to cover a significant portion of her utilities. (Tr. at 59-60.)

{¶ 9} McKay testified that she has had conversations with the children that indicate appellant still has an ongoing relationship with G.J. (Tr. at 61.) According to McKay, during one of the visits, appellant put G.J. on the phone with the children. McKay stated that appellant has referred to herself by G.J.'s last name on Facebook. (Tr. at 61.) Appellant has also referred to G.J. as her fiancé. (Tr. at 62.) McKay testified as to her concerns regarding their ongoing relationship if the children are returned home. "[T.N.] has spoke (sic) with his counselor about previous concerns as when they were living together when [G.J.], [appellant], and all the children were living together, he referenced going into the bathroom and possibly some inappropriate touching. He has also referenced to me personally that he is -- he doesn't want to see [G.J.]. He doesn't want to speak to him. He's actually afraid of his mother to be around him." (Tr. at 62.) McKay stated that T.N. also referenced witnessing a domestic violence situation and did not want to return if G.J. was going to be in the home. (Tr. at 63.) McKay testified that she believes, based on all the available information, that appellant's housing is not appropriate for the children. (Tr. at 63.)

{¶ 10} McKay is not aware of appellant being employed at this time. (Tr. at 63.) McKay testified that appellant's employment has been "very scattered, short time-framed." (Tr. at 64.) Appellant's most recent employment was at Stanley Electric where she worked

for five months before she was not retained going forward. According to McKay, appellant started receiving unemployment compensation at that time. (Tr. at 64.) McKay is not aware of any other income but believes appellant is receiving food assistance. (Tr. at 66.) McKay testified that appellant has not provided a plan for daycare if she is able to return to work and the children are returned. McKay characterized appellant's employment as "unstable." (Tr. at 68.) McKay believes appellant has completed the case plan for housing but not employment despite the house not being suitable for the children to return.

{¶ 11} McKay testified that appellant has completed a drug and alcohol assessment. (Tr. at 68.) McKay stated that appellant admitted she was addicted to gabapentin as well as taken Percocet following some dental work. (Tr. at 69.) McKay says appellant was participating in programing with First Step Recovery for less than a year before going to another treatment program, Community for New Directions, in 2017. Appellant's assessment indicated she should participate in intensive out-patient programing. (Tr. at 71.) This included several individual and group sessions throughout the week in addition to a prescription for Suboxone to assist with the addiction. (Tr. at 71.) Appellant was discharged from the program at Community for New Directions for missing appointments. (Tr. at 70, 72.) Appellant told McKay that she missed appointments because of transportation. McKay noted there was a third program named Arizona Counseling. (Tr. at 70.) Appellant self-discharged from the program. McKay testified there was a gap in treatment before she later did an AOD assessment with Brightview in Springfield. (Tr. at 72-73.) According to McKay, she is not aware of appellant completing any treatment program. As of April 2021, Brightview noted that appellant's participation percentage is around 47 percent. (Tr. at 73.) McKay noted that there are not any significant barriers since the programing had gone virtual. Appellant has historically had significant trouble with her transportation. Brightview requires appellant to provide scheduled drug screening once a month. Appellant had a positive screen for cocaine as recently as October 2020. (Tr. at 75.)

{¶ 12} McKay testified that due to the lack of frequent drug screens, lack of random screens, and ongoing positive screens, she does not have assurances of appellant's sobriety. (Tr. at 76.) According to McKay, appellant has shared that the positive screen for cocaine was from stress between caring for her mother and seeking employment. McKay does not

believe appellant has completed the assessment and followed the recommendations portion of her case plan.  (Tr. at 77.)

{¶ 13} McKay testified that her last random drug screen for FCCS was in 2018. McKay provided appellant gas cards to help with transportation on at least seven occasions. Appellant did complete her domestic violence assessment as required under the case plan, in November 2019.  (Tr. at 80.)  However, "[t]he recommendation portion of that assessment actually stated that mom felt that she did not need any services in regards to domestic violence and that was the Agency's recommendation."  (Tr. at 80.)  The recommendation stated that appellant felt that she did not need any domestic violence services.  McKay disagreed with that assessment as appellant has been involved in domestic violence situations on two occasions since the case was opened, and she believes the assessment was based on appellant's statement not a recommendation from the provider. (Tr. at 81-82.)  According to McKay, appellant was the perpetrator of one of the domestic violence situations.  "What [appellant] explained to me is that she was at her sister's home, there was a dispute with a guy.  Her and her sister were -- got -- got into a physical altercation with this guy and at the court proceedings she actually took a deal * * * she did not receive a -- a DV charge out of that."  (Tr. at 82.)  McKay stated that she also has concerns about domestic violence in the ongoing relationship with G.J.  McKay testified that appellant has not been involved in any of the children's medical care, does not understand the children's medical needs, and has not come to any appointments.  (Tr. at 84-85.)  McKay testified that appellant has also not been involved in the children's education throughout the case.

{¶ 14} According to McKay, appellant's visits with the children have been "very scattered."  (Tr. at 86.)  The children do not know if appellant will show up to the visit. McKay testified that appellant has been removed from the visitation schedule at least five times for a significant duration.  To be removed from the visitation schedule you must miss three consecutive visits.  Appellant has had multiple periods of 90 days without any visits with the children.  During periods from April 2019 to June 2019, April 2020 to September 2020, and December 2020 to present appellant did not visit with the children.  (Tr. at 87-88.)  McKay did acknowledge that the period from April to September 2020 was impacted by COVID-19, but appellant did not participate in virtual visits.  (Tr. at 88.)  McKay testified

as to concerns about appellant's behavior during visits as she would bring family members, did not engage with the children, and would primarily speak to the family members during the visits. Appellant would become hostile when they reduced the amount of people during the visits. "The Columbus Police, we have an officer in the building has had to get involved and de-escalate situations with mother." (Tr. at 89.) There were a couple of situations that escalated in front of the children. Appellant would also sneak the children candy despite concerns with the children's dental health. (Tr. at 90.) McKay testified that appellant struggled dividing her time between the children during visitation.

{¶ 15} McKay stated that appellant has not participated in any of the semi-annual reviews with the services team. McKay testified that no other family member has come forward asking for placement or legal custody of the children. (Tr. at 93.) According to McKay, appellant has not met with her regularly. McKay stated that there were periods when appellant would go to visits but then lost contact because appellant moved around. McKay testified to trying to meet before visits with the children, but appellant would often run late. According to McKay, she made a couple attempts to visit appellant in Springfield, but no one was home or answering the door. (Tr. at 96.) McKay did state that appellant met her obligations to sign releases. (Tr. at 96-97.) McKay testified that appellant has participated in drug screens, but the tests were not random as required in the case plan.

{¶ 16} McKay described the current foster placement as a home with two parents, and an adoptive 11-year-old male in addition to the children in this case. (Tr. at 98.) McKay stated the foster parents are actively involved in the children's medical care, schooling, and activities. According to McKay, the children are bonded with the foster parents and another boy in the foster home. (Tr. at 92, 99.) They go on trips together, cook together, and engage in extracurricular activities. The home is a potentially adoptive home. (Tr. at 101.) McKay stated that T.N. and Gm.J. have special needs. T.N. has ADHD and Gm.J. has a type of attachment disorder involving a sexualized behavior. (Tr. at 103.) The children are currently in counseling. (Tr. at 101-02.) Gi.J. has a condition from birth similar to bronchitis. All the children have asthma. T.N. is on a 504 plan for school related to his ADHD. (Tr. at 103.) McKay testified that the children need legal secure placement, and she is asking the court to grant to permanent custody. (Tr. at 104.) McKay stated that T.N. does not appear to like his interactions with appellant. "I most recently talked to him about

visits being re-instated. He asked me why they have to be re-instated and he felt like he didn't want to see his mother." (Tr. at 104.) Gm.J. expressed desire to reside with foster parents as her relationship with appellant had diminished based on the inconsistency with the visits. (Tr. at 104-05.) Gi.J. is the youngest and has been in foster care since she was a baby. (Tr. at 104.) According to McKay, the children refer to both appellant and their foster mother as mother.

{¶ 17} On cross-examination, McKay testified that appellant had not asked her about the children's medical treatment, health, or schooling. (Tr. at 107.) McKay stated that appellant smokes and has been diagnosed with diabetes that has resulted in some hospital stays. (Tr. at 107.) McKay testified that the children are in counseling in the home three times a week and meet with a specialist once a week. (Tr. at 108.) Appellant has been in counseling the last four or five years for substance abuse but has not completed that part of her case plan because of the positive screens. (Tr. at 111.) McKay testified that appellant would "struggle" to meet the basic needs of the children. (Tr. at 112.) McKay has concerns "[p]rimarily [with appellant's] ability to protect the children, physically her commitment and ability to ensure that the children also receive their services that they need for their own -- own mental health and health reasons and basically, her own safety if she does currently carry a relationship with [G.J.]." (Tr. at 112.)

{¶ 18} McKay testified that the initial safety plan occurred in December 2015 before the complaint was filed. The aunt involved did not want to participate in the placement of the children after that period. McKay acknowledged that on her visit to the Springfield home she did not observe anything that indicated a man lived there, and the appellant's mother was present in the bedroom. (Tr. at 116.) McKay stated that she has not personally observed appellant with G.J. but there have been conversations between appellant and the children indicating they were together. McKay conceded that while appellant's employment has often been short term there is no reason to think that she cannot find work in the future. (Tr. at 119.) McKay acknowledged that appellant found the providers on her own, but they were referrals. (Tr. at 120.) Appellant has continued to look for treatment and is taking Suboxone. (Tr. at 121.) McKay also acknowledged that she is not aware of any other altercations involving appellant since the 2017 incident with her sister. (Tr. at 123.) McKay testified that appellant was invited to parent-teacher conferences for school.

McKay conceded that during the visitations, the children would be vying for appellant's attention, which indicated a bond at that time. (Tr. at 126.) McKay testified that there are no guarantees that the foster family will ultimately adopt the children. McKay stated it might have been easier to meet during COVID because it could be done virtually. (Tr. at 129-30.) McKay was never able to meet with appellant virtually. (Tr. at 130.) According to McKay, the foster mom allows appellant to regularly call and speak with the children. (Tr. at 135.) Appellant would call the kids for their birthdays, but appellant has not done that since December. (Tr. at 135.)

{¶ 19} Lorelei Lanier testified that she has been an attorney for the last 40 years and is trained as a guardian ad litem ("GAL"). (Tr. at 137-38.) Lanier was appointed in this case in May 2016. Lanier testified to visiting the children between 10-15 times for approximately an hour each visit. (Tr. at 140.) According to Lanier, the children interact with the foster mother like they would a mother and are bonded with the parents. While the father is often working during the visits, the children "speak of him quite fondly." (Tr. at 141.) Lanier testified, "[t]he kids feels comfortable to be upset if they are upset, to, you know, just reacting in normal childhood ways and not in ways that a child might act if they felt like they were in somebody else's home." (Tr. at 141.) Lanier stated that the children are also bonded with the other foster child.

{¶ 20} According to Lanier, her last visit with the children was two weeks ago. Lanier testified that the children expressed desire on placement. T.N. did not want to return to appellant's home. Gm.J. also did not want to return to appellant's home. Lanier testified that she did not feel like Gi.J. understood the issue. (Tr. at 143.) According to Lanier, the last visit between the children and appellant was very chaotic. Appellant brought dinner and presents. When the children saw the presents, they did not want to eat dinner. (Tr. at 145.) Lanier testified that she felt appellant was trying to do well but "just wasn't used to how kids are and how you kind of have to organize a kid's time." (Tr. at 145.) Lanier testified that the visits have been extremely inconsistent, and the children have been sad and disappointed when appellant does not show up. (Tr. at 146.) The children, other than T.N., do not remember her as a parent. Lanier has not had an opportunity to visit appellant's current residence. The children are in counseling at least one or two times per week in school and one or two times per week out of school. (Tr. at 149.) Lanier stated the

children are doing very well in counseling.  Lanier testified that she believes appellant has not complied with her case plan.  (Tr. at 151.)

{¶ 21} Lanier testified that appellant posted on Facebook that she traveled to California purportedly with G.J.  (Tr. at 152.)  Lanier testified that the children are in need of legally secure placement.  According to Lanier, it would be in the children's best interest to grant the motion for permanent custody.  Lanier stated:

> [t]he most significant factor in my mind is the [appellant's] lack of commitment and engagement with her children.  She doesn't visit consistently.  She doesn't call consistently.  She's not aware of their medical needs, their ed -- educational needs; that's the biggest factor for me.  I'm not sure that she's drug free.  I -- I feel like her home is from all accounts is fine.  I'm convinced that she's in a relationship with G.J. and he is one mean, scary person.

(Tr. at 164.)

{¶ 22} Lanier also believed that appellant is not capable at this time of managing the children's medical and school needs.  (Tr. at 164-65.)

{¶ 23} On cross-examination, Lanier stated appellant's lack of commitment and engagement has negatively impacted the children.  Lanier used as an example that the children were excited to see appellant around the holidays, but she did not show up.  (Tr. at 166.)  Lanier does not believe appellant can meet the children's basic needs.  (Tr. at 167.)  At the conclusion of Lanier's testimony, the trial court recessed for the day.

{¶ 24} On May 27, 2021, appellant appeared in court.  Appellant testified she understands her case plan, but she contends she has never gone over it with her case worker.  (May 27, 2021 Tr. at 7.)  Appellant stated she has signed releases of information so the caseworker can get the results of the screens.  Appellant contends she is not aware of any positive screens in the last 12 months.  (Tr. at 12.)  Appellant has screened positive for cocaine in the last 18 months.  (Tr. at 12.)  Appellant is getting treatment with Suboxone at Brightview.  (Tr. at 12-13.)  Appellant testified the treatment usually includes a scheduled drug screen and two group sessions per week over zoom.  (Tr. at 14.)

{¶ 25} Appellant described the various programing she has participated in during the case.  The first program she had a conflict with the counselor from outside the program, and she did not feel comfortable.  Appellant also described transportation issues going back

and forth from Springfield. Appellant stated that she has learned accountability for her actions and coping mechanisms for her addiction. "I did not know that I was a[n] addict when I started the program. I didn't know nothing about drugs. * * * They taught me a lot." (Tr. at 16.) Appellant testified that she relapsed because she was overwhelmed and had not seen her children much. Appellant also noted that her mother's illness contributed to the relapse as well. (Tr. at 17.) Appellant plans to keep working on her treatment issues after the case is closed. (Tr. at 18.)

{¶ 26} Appellant testified that she did the domestic violence assessment at Project Woman in Springfield, Ohio. According to appellant, the counselor did not recommend that she needed further counseling for domestic violence. Appellant testified that her only incident with domestic violence in the last three years was in June 2017. Appellant testified that she has stable housing as she has lived in the same residence since February 2019. The home has four bedrooms and is fully furnished. Appellant stated she lives there alone, but her mom has stayed with her for the night on occasion. (Tr. at 19.) Appellant testified that she found her home, not FCCS, and qualified for the Section VIII program. FCCS helped furnish the residence. Appellant acknowledged that she is not employed, and her last job was as a security guard for Securitas Security in March 2020. (Tr. at 22.) Appellant testified COVID has impacted her work because less people are hiring in Springfield. According to appellant, FCCS has not helped her with her search for employment. (Tr. at 23.)

{¶ 27} Appellant testified she is not romantically involved with anyone. Appellant went on a trip between March 18 to March 20, 2021 to California with her mother and other family members. (Tr. at 26.) Appellant described difficulties with visitation. According to appellant, the foster mom caught COVID then they went to Michigan. Appellant visited the children after they returned. Appellant also claims her vehicle was stolen. Consequently, appellant did not have transportation for an extended period of time. (Tr. at 28.) Appellant has had difficulty with arranging a visit virtually with the caseworker. (Tr. at 28.) Appellant stated she bought a new vehicle about a month ago. Appellant described more communication issues with the caseworker, which resulted in delays in visits.

{¶ 28} Appellant described normal visits where she would bring food and snacks until they said to stop bringing candy. Appellant testified to bringing gifts and toys on the visits. (Tr. at 31.) According to appellant she has no relationship with the foster mother

and met the foster father one time. (Tr. at 32.) According to appellant, she called the abuse hotline on the foster parents, but nothing came of it. Appellant contends when they were first placed, appellant was not able to see the kids for two, three months. Appellant believes that the children are on medication and "like they became zombies, like so they wouldn't talk to me." (Tr. at 34.)

{¶ 29} While appellant conceded that she does smoke, she does not smoke in the house. (Tr. at 36.) Appellant says she is not engaged to be married to anyone. Appellant stated she has a support system of her mother and sister, who has several children, in Springfield. Appellant testified that she considers Facebook as entertainment. (Tr. at 37.) Appellant stated there is a video of her at a party where there was alcohol, and a child had a toy gun. Appellant testified that it was a fake gun, and the child was showing her the toy. (Tr. at 38, 84.) Appellant denied ever having images of real guns on her Facebook page.

{¶ 30} On cross-examination, appellant conceded that she has made mistakes by using cocaine and by not communicating better with her caseworker. (Tr. at 41.) Appellant testified she has seen G.J. a few times since he was released from prison. Appellant stated the last time she saw G.J. was in October. Despite acknowledging that she is not to drink alcohol during her drug treatment program, appellant conceded she drinks alcohol. Appellant does not have a valid driver's license for the last few months as she has not paid her insurance. (Tr. at 43-44.) Appellant testified she communicates with the caseworker over email. Appellant described communication issues with her caseworker and issues with her various phone numbers.

{¶ 31} Appellant admitted to addiction issues with tramadol, but she does not believe she is addicted to gabapentin as she was prescribed the medication. Appellant does not believe she has an addiction to alcohol. (Tr. at 51.) Appellant testified that she engages in group sessions with Brightview but acknowledged that her compliance in April was only around 37 percent. Appellant stated her missed virtual visits were because her phone was turned off. (Tr. at 59.) Appellant acknowledged that she was compliant in March less than half the time as well. (Tr. at 61.) Appellant contends that the caseworker gave her a resource list for jobs and housing but not for doctors. (Tr. at 64.)

{¶ 32} While appellant acknowledged that the caseworker set up drug screens for her prior to her visitation with the children, she testified that she would be coming from

work at that time and would have to go right to the visit. (Tr. at 65-66.) Appellant also acknowledged that she stays in contact with G.J. Appellant last spoke to G.J. on May 26, the first day of trial. Appellant conceded she has referred to G.J. as her fiancé multiple times on Facebook but the relationship ended two weeks after G.J. was released from prison. (Tr. at 87.) Appellant testified she uses Facebook to be funny and as entertainment. (Tr. at 114.)

{¶ 33} Appellant testified to various other employments that lasted a few months. (Tr. at 93-94.) Appellant has been on unemployment since March 2020, but she has been looking for employment. (Tr. at 99.) Appellant is not aware of any education special needs diagnoses with the children but seemed to be aware that there were some behavioral issues with the children. (Tr. at 102.) Appellant testified the last time she saw her children was December 2020. (Tr. at 104.) Appellant also acknowledged there have been long periods of time she has not seen the children but contends that she did not stop trying to visit. (Tr. at 105.) Appellant conceded that she was removed from the visit schedule five times and had to be re-added because of inconsistencies with visits. (Tr. at 105.) Appellant believes the children are bonded with her based on their behavior at visits. (Tr. at 107.) Appellant testified that she has not been to any parent-teacher conferences this year, but she argued that she did not realize she was allowed to participate. (Tr. at 109.) Appellant testified she attended two annual reviews of the children around 2017-2018. (Tr. at 110.) The parties provided closing statements, and the trial court took the matter under advisement.

{¶ 34} On August 6, 2021, the trial court awarded FCCS provisional temporary custody of the children. The trial court found the children had been in the custody of FCCS for 12 out of 22-months and that permanent custody was in their best interests. Appellant filed timely appeals on August 27, 2021.

## II. ASSIGNMENTS OF ERROR

{¶ 35} Appellant submits the following assignments of error:

> [1] The agency did not demonstrate that reasonable efforts were made to reunify the family.
>
> [2] The weight of the evidence did not support the termination of parental rights and award of permanent custody to the agency.

## III. LEGAL ANALYSIS

### A. Appellant's First Assignment of Error

{¶ 36} In appellant's first assignment of error, she argues that FCCS did not make reasonable efforts to reunify the family.

{¶ 37} Pursuant to R.C. 2151.419(A)(1), "the court shall determine whether the public children services agency * * * has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home. The agency shall have the burden of proving that it has made those reasonable efforts." In *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 43, the Supreme Court of Ohio has found that the reasonable efforts provision of R.C. 2151.419(A)(1) does not apply in a hearing on a motion for permanent custody filed under R.C. 2151.413. The *C.F.* court explained:

> While these cases present conflicting views on the applicability of R.C. 2151.419 in a permanent-custody hearing, we do not see that issue as determinative of this case or of the certified-conflict issues. By its terms, R.C. 2151.419 applies only at hearings held pursuant to R.C. 2151.28, 2151.31(E), 2151.314, 2151.33 or 2151.353. *See* R.C. 2151.419(A)(1). These sections involve adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state. The statute makes no reference to a hearing on a motion for permanent custody. Therefore, "[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414." *In re A.C.*, supra, 2004-Ohio-5531, ¶ 30.

*In re C.F.* at ¶ 41.

{¶ 38} The Supreme Court went on to note that this does not relieve FCCS of the duty to make reasonable efforts to reunify the family:

> At various stages of the child-custody proceeding, the agency may be required under other statutes to prove that it has made reasonable efforts toward family reunification. To the extent that the trial court relies on R.C. 2151.414(E)(1) at a permanency hearing, the court must examine the "reasonable case planning and diligent efforts by the agency to assist the parents" when considering whether the child cannot or should

not be placed with the parent within a reasonable time. However, the procedures in R.C. 2151.414 do not mandate that the court make a determination whether reasonable efforts have been made in every R.C. 2151.413 motion for permanent custody.

*Id.* at ¶ 42.

{¶ 39} While the Supreme Court concluded that R.C. 2151.419(A)(1) does not apply to a hearing on a motion for permanent custody filed under R.C. 2151.413, FCCS must still make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights. *Id.* at ¶ 43. If FCCS does not demonstrate that reasonable efforts were made before the hearing, then it must demonstrate at the hearing that reasonable efforts to reunify were made by the agency. *Id.* at ¶ 4 ("[T]he state must make reasonable efforts to reunify the family before terminating parental rights. If the agency has not already proven reasonable efforts, it must do so at the hearing on a motion for permanent custody.").

{¶ 40} In the case sub judice, we need not reach the question of whether FCCS made reasonable efforts to reunify the children with appellant as the record indicates appellant abandoned the children. Pursuant to R.C. 2151.419(A)(2):

(2) If any of the following apply, the court shall make a determination that the agency is not required to make reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal of the child from the child's home, and return the child to the child's home:

\* \* \*

(d) The parent from whom the child was removed has abandoned the child.

{¶ 41} This court has found that, as set forth in R.C. 2151.011(C), "[f]or the purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." *In re R.G.S.*, 10th Dist. No. 20AP-101, 2020-Ohio-6696, ¶ 60; *In re B.G.W.*, 10th Dist. No. 08AP-181, 2008-Ohio-3693, ¶ 17. Here, the trial court found, "(appellant) missed many visits with her children and two periods of more than ninety consecutive days. She has also been removed five times from the visiting schedule each time for missing more than three

consecutive visits. * * * She has abandoned her children." (Aug. 6, 2021 Decision & Entry at 19.) Upon review, the record reflects that the juvenile court properly found the children were abandoned, regardless of any later efforts by appellant to resume contact. *In re B.G.W.* at ¶ 17. Because the trial court determined the children were abandoned there was no requirement for a finding that reasonable efforts were made to unify the children with appellant. *In re T.M.*, 10th Dist. No. 18AP-943, 2020-Ohio-815, ¶ 23; *In re A.E.*, 10th Dist. No. 07AP-685, 2008-Ohio-1375, ¶ 17 (finding that if the parents abandoned the children, "that the juvenile court was not required to make a finding that FCCS made reasonable efforts to reunify the family").

{¶ 42} While appellant appears to not dispute that she failed to visit the children during these periods, she argues that FCCS made little effort to facilitate reunification. We find this argument unpersuasive. While this court sympathizes with appellant, she failed to visit or maintain contact with the children for over 90 days relieving the trial court of making a reasonable efforts determination.

{¶ 43} Appellant's first assignment of error is overruled.

**B. Appellant's Second Assignment of Error**

{¶ 44} In appellant's second assignment of error, she argues the juvenile court's judgment terminating parental rights and awarding permanent custody to FCCS was not supported by the weight of the evidence.

{¶ 45} The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and Article I, Section 16, of the Ohio Constitution protect an individual's right to parent one's child. *In re H.S.*, 10th Dist. No. 21AP-190, 2022-Ohio-506, ¶ 47, citing *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 6; *see also In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("[T]he right to raise one's children is an 'essential' and 'basic civil right.' "). It is well established law that a parent has a " 'fundamental liberty interest' " in the management, care, and custody of their children. *Murray* at 157, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' * * * Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991). Despite an individual's

fundamental right to parent one's child, the state has broad authority to intervene to protect a child from abuse and neglect. *In re C.F.* at ¶ 28, citing R.C. 2151.01. "An award of permanent custody, which terminates parental rights, is an ' "alternative of last resort and is only justified when it is necessary for the welfare of the children." ' " *In re R.G.S.* at ¶ 35, quoting *In re C.G.*, 10th Dist. No. 13AP-632, 2014-Ohio-279, ¶ 28, quoting *In re Swisher*, 10th Dist. No. 02AP-1408, 2003-Ohio-5446, ¶ 26.

{¶ 46} Pursuant to R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to a public children services agency "if the court determines * * * by clear and convincing evidence[3], that it is in the best interest of the child to grant permanent custody of the child to the agency" and that one of the circumstances set forth in R.C. 2151(B)(1)(a) through (e) are applicable. R.C. 2151(B)(1)(a) through (e) provides:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.
>
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on

---

[3] " 'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *In re L.B.*, 10th Dist. No. 19AP-644, 2020-Ohio-3045, ¶ 24, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

> three separate occasions by any court in this state or another
> state.

R.C. 2151.414(B)(1)(a) through (e).

{¶ 47} If the juvenile court finds that one of the above circumstances is applicable to the case at hand, the court then looks to R.C. 2151.414(D)(1) to resolve whether granting permanent custody is in the best interest of the child. When determining the child's best interest, the juvenile court "shall consider all relevant factors, including, but not limited to, the following:"

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.[4]

---

[4] R.C. 2151.414(E)(7) through (11) provide additional factors such as:

> (7) The parent has been convicted of or pleaded guilty to one of [a list of criminal offenses].
>
> (8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
>
> (9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

R.C. 2151.414(D)(1)(a) through (e).

{¶ 48} While a trial court is not required to enumerate each R.C. 2151.414(D) factor, it must make some indication on the record that all the requisite factors were considered. *In re T.W.*, 10th Dist. No. 19AP-700, 2020-Ohio-4712, ¶ 12, citing *In re C.C.*, 10th Dist. No. 04AP-883, 2005-Ohio-5163, ¶ 53. None of the factors are entitled to greater weight than the other. *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

{¶ 49} A trial court's conclusion that it was in the best interest of the children to grant a motion for permanent custody will not be reversed by a reviewing court unless the determination is against the manifest weight of the evidence. *In re J.J.*, 10th Dist. No. 21AP-166, 2022-Ohio-907, ¶ 18, citing *In re I.R.*, 10th Dist. No. 04AP-1296, 2005-Ohio-6622, ¶ 4. " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered at trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' " (Emphasis omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "Thus, in reviewing a judgment under the manifest weight standard, an appellate court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed, and a new trial ordered." *In re R.P.*, 10th Dist. No. 20AP-538, 2021-Ohio-4065, ¶ 36, citing *Eastley* at ¶ 20. Judgments in a permanent custody matter are not against manifest weight of the evidence when all material elements are based upon competent, credible evidence. *In re J.J.* at ¶ 18, quoting *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 9. "The discretion which the juvenile court enjoys

---

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

R.C. 2151.414(E)(7) through (11).

in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceedings and the impact the court's determination will have on the lives of the parties concerned." (Citations omitted.) *In re R.P.* at ¶ 37.

**{¶ 50}** Preliminarily, appellant concedes that the children have been in the custody of FCCS for 12 or more months of a 22-month period when FCCS moved for permanent custody. (Appellant's Brief at 22.)[5] Accordingly, our review is limited to whether the juvenile court's judgment that terminating parental rights and awarding permanent custody to FCCS was in the best interest of the children was supported by the manifest weight of the evidence. *L.B.* at ¶ 29, citing *L.W.* at ¶ 13.

### 1. Children's Interactions and Relationships (R.C. 2151.414(D)(1)(a))

**{¶ 51}** Pursuant to R.C. 2151.414(D)(1)(a), the first factor in determining whether a grant of permanent custody is in the children's best interest looks at the children's interactions and relationships with the parents, siblings, foster caregivers, and others. Appellant argues that permanent custody should not be granted as the children are bonded with appellant and that the bond will be broken by granting permanent custody.

**{¶ 52}** The record indicates that T.N.'s father, R.R., was arrested on two counts of murder when he was an infant and has been incarcerated since that time. Similarly, Gi.J. and Gm.J.'s father, G.J., was incarcerated for four years and was released from prison in August 2020. Neither father participated in the case plan nor filed appeals in these cases.

**{¶ 53}** The record also indicates the children do not know appellant as a parent due to inconsistent visitation since they were removed from her care. Lanier testified that the children, other than T.N., do not remember appellant as a parent. Lanier felt appellant was trying to do well but "just wasn't used to how kids are and how you kind of have to organize a kid's time." (May 26, 2021 Tr. at 145.) Lanier stated that the visits have been extremely inconsistent, and the children have been sad and disappointed when appellant would not show up for visitation. (Tr. at 146.)

---

[5] "In this case, the trial court found that the first part of the permanent custody test was satisfied because the children had been in the custody of the agency for twelve of twenty-two months. R.C. 2151.414(B)(1)(d). Appellant does not contest that finding and will instead focus the analysis on best interests." (Appellant's Brief at 22.)

{¶ 54} Appellant contends that there is a bond between the children and appellant and "[t]his bond should not be lightly thrown away." (Appellant's Brief at 25.) Appellant contends the bond between her and the children is clear by the children's behavior during visitation. However, while a bond and relationship of the children to the parents is a factor, it is not controlling. " '[The] resolution of [R.C. 2151.414(D)(1)(a)] is not limited to merely the bond between child and parent.' " *In re B.B.*, 10th Dist. No. 20AP-488, 2021-Ohio-2299, ¶ 60, quoting *In re K.R.*, 10th Dist. No. 18AP-633, 2019-Ohio-2192, ¶ 81. While appellant did make some efforts to bring food during these visits, we cannot ignore the continued absences in visitation. Appellant was removed from the visitation schedule at least five times for a significant duration. McKay stated that to be removed from the visitation schedule you have to miss three consecutive visits. (Tr. at 86-88.) Appellant has had multiple periods of 90 days without any visits with the children. As such, whatever bond between appellant and the children has diminished due to her lack of contact with the children. Appellant also struggled to divide her attention among the children and would invite other family members to visitation. (Tr. at 89.) Appellant would become hostile when they reduced the amount of people during the visits. McKay testified, "The Columbus Police, we have an officer in the building has had to get involved and de-escalate situations with mother." (Tr. at 89.) McKay described the visits as "chaotic." (Tr. at 89.) There is also little evidence of interaction with other family members outside some participation in visits. Regarding G.J., T.N. witnessed domestic violence between G.J. and appellant when they lived together at their home. T.N. also indicated there was inappropriate touching by G.J. (Tr. at 62.) According to McKay, T.N. did not want to be returned to appellant's care if G.J. was going to be in the residence. (Tr. at 63.)

{¶ 55} Conversely, the record indicates the children have the strongest bond with the foster parents. Gi.J. has been with the foster parents since she was a baby and only knows them as her parents. (Tr. at 104.) The children call the foster parents, "mother" and "father." (Tr. at 91, 100.) McKay testified that the children are also bonded with another boy in the foster home. (Tr. at 92.)

{¶ 56} According to Lanier, the children interact with the foster mother like they would a mother. While the father is often working during the visits the children "speak of him quite fondly." (Tr. at 141.) Lanier testified, "[t]he kids feels comfortable to be upset if

they are upset, to, you know, just reacting in normal childhood ways and not in ways that a child might act if they felt like they were in somebody else's home." (Tr. at 141.) Based on the foregoing, there is an identified bond between the children and foster parents that favors the grant of permanent custody.

### 2. Children's Wishes (R.C. 2151.414(D)(1)(b))

{¶ 57} Next, we consider the custodial wishes of the children. Both McKay and Lanier, testified that T.N. and Gm.J. did not want to return to appellant's care. (Tr. at 104-05, 142-43.) Lanier testified that she did not feel like Gi.J. understood the issue. (Tr. at 143.) Gi.J. did not appear to appreciate the gravity of the situation as she seemed to want reunification if she was provided a puppy and a gift. Lanier recommended that permanent custody be granted. Given the recommendation of the GAL and wishes of the children, this factor favors the award of permanent custody.

### 3. Custodial History (R.C. 2151.414(D)(1)(c))

{¶ 58} We next look at the children's custodial history, including whether the children have been in the temporary custody of the public service agency for 12 or more months of a consecutive 22-month period.

{¶ 59} The record demonstrates the children have been in the custody of FCCS since February 16, 2016. (Tr. at 39.) The children were adjudicated neglected and dependent on July 27, 2016 and temporary custody was granted to FCCS. McKay testified that the children were initially placed with kinship family in a single home with their paternal aunt and paternal grandmother. The placement was disrupted as there was not proper supervision. According to McKay, appellant had taken the children out of the home unsupervised on several occasions. (Tr. at 41.) McKay testified that FCCS tried to make the kinship placement work, but it was unsuccessful. The children were then placed in a foster home where they are still located. (Tr. at 42.) As the children have been in placement for more than 12 of a consecutive 22-month period as per the statutory calculation noted above, this factor favors the award of permanent custody.

### 4. The Children's Need for a Legally Secure Permanent Placement (R.C. 2151.414(D)(1)(d))

{¶ 60} The fourth factor considers the children's need for legally secure placement and whether the type of placement can be achieved without granting permanent custody to FCCS.

{¶ 61} Throughout the case, appellant has failed to substantially comply with her case plan. While appellant signed the releases as requested, appellant has been unsuccessful in completing a single drug treatment program in the five years of the case plan.

{¶ 62} Appellant argues that the drug use arose from prescription pain killers, she has acknowledged her addiction, and has sought out treatment on her own. However, appellant has failed to demonstrate sobriety. Appellant failed to complete multiple programs and, as of April 2021, Brightview noted that appellant's participation percentage is around 47 percent. (Tr. at 73.) Appellant argues that her last positive test was six months before trial and has tested clean for long periods of time prior to this most recent period of sobriety. We also find this argument unpersuasive. Appellant currently is taking scheduled screens and has failed to set up random drug screening for multiple years as required in her case plan. Despite the scheduled screens, appellant tested positive for cocaine in October 2020. As appellant has failed to participate in random drug screens, she has failed to complete this aspect of her case plan.

{¶ 63} Regarding employment, appellant has demonstrated some effort to comply with this aspect of her case plan holding multiple jobs over the last few years, but she has failed to maintain any of these jobs more than a few months. Appellant has been unemployed since March 2020. (May 27, 2021 Tr. at 99.) There are also multiple incidents of domestic violence in the record. McKay testified that she became involved in this case out of concerns originally involving domestic violence with G.J. and appellant in the home where the children resided. There was also another incident involving appellant and her sister. According to McKay, appellant was the perpetrator of the domestic violence situation testifying "[w]hat she explained to me is that she was at her sister's home, there was a dispute with a guy. Her and her sister were -- got -- got into a physical altercation with this guy and at the court proceedings she actually took a deal * * * she did not receive

a -- a DV charge out of that." (May 26, 2021 Tr. at 82.) While the domestic violence assessment indicated appellant did not require further programming, McKay testified that "[t]he recommendation portion of that assessment actually stated that mom felt that she did not need any services in regards to domestic violence and that was the Agency's recommendation." (Tr. at 80.) Finally, appellant has failed to participate in the semi-annual review process. (Tr. at 93.)

{¶ 64} Appellant argues that she has maintained appropriate housing for the children for a lengthy period of time and has a network of family support in Springfield, including her maternal grandmother and maternal aunt. While evidence at trial indicates the house itself appears appropriate, appellant's relationship with G.J. creates a concern as to the safety of the children if placed with appellant. Lanier testified that she believes appellant is still in a relationship with G.J. who is "one mean, scary person." (Tr. at 164.) T.N. referenced domestic violence and inappropriate touching involving G.J. when the children resided with appellant. (Tr. at 62-63.) While appellant contends she ended her relationship with G.J., appellant also acknowledged maintaining communication with G.J. While appellant argues that it is reasonable to expect her to maintain contact with G.J., as he is the father of two of her children, given the allegations of violence, their on-going relationship is relevant to the consideration of whether appellant can maintain a safe household. Furthermore, it is also worth noting that appellant's Facebook page indicates she has assumed his last name and has repeatedly called G.J. her fiancé on the social media platform.

{¶ 65} Finally, as noted by the trial court, the children all have special needs requiring parental consistency and reliable transportation to school and counseling. (Aug. 6, 2021 Decision & Jgmt. Entry at 14.) T.N. suffers from ADHD, Gm.J. suffers from attachment disorder, and all three children have asthma. (Tr. at 101-02, 150.) McKay testified appellant had significant trouble with transportation. Appellant has lived in Springfield for several years and, despite McKay providing multiple gas cards, has consistently failed to make visits. Appellant conceded these missed visits impacted her relationship with the children. (Tr. at 79.) Lanier testified that she believes appellant is not capable at this time of managing the children's medical and school needs. (Tr. at 164-65.) McKay testified that appellant has not been involved in any of the children's medical care,

does not understand the children's medical needs, and has not come to any appointments. (Tr. at 84-85.) McKay testified that appellant was also not involved in the children's education throughout the case. Appellant was not aware of any education special needs diagnoses with the children but seemed to acknowledge there were some behavioral issues. (Tr. at 102-03.) Both McKay and Lanier agreed appellant has not completed her case plan. As for the foster care placement, the foster parents are bonded with the children and are interested in adopting the children.

{¶ 66} Appellant takes exception to the trial court's comments that she "continues to glorify an alternative culture unsuitable to parenting and maintains relationships which are not in the best interests of her children." (Aug. 6, 2021 Decision & Jgmt. Entry at 16.) Appellant posited this comment could have been in reference to the Facebook video that showed appellant at a party where there was alcohol and a child playing with a toy gun or in reference to her contact with G.J. Appellant contends that being caught in an abusive relationship is not alternative culture. Upon review, while the trial court's phrasing is problematic to say the least, we find it has no consequence on the overall analysis of the decision. There is no doubt that appellant's continued relationship with G.J. is a factor in our best interest analysis, we place little value on the Facebook post as there is more persuasive and, frankly, troubling evidence presented at the hearing. Accordingly, appellant has not demonstrated that she is a legally secure permanent placement for the children.

{¶ 67} Based on the foregoing, there is a clear need for the children to have legally secure permanent placement, which cannot be achieved without a grant of permanent custody to FCCS.

### 5. Other Factors (R.C. 2151.414(D)(1)(e))

{¶ 68} Finally, the fifth factor in determining whether a grant of permanent custody is in the children's best interest looks at whether certain other statutory factors are applicable to the instant case. R.C. 2151.414(D)(1)(e).

{¶ 69} Here, R.C. 2151.414(E)(10) applies as appellant abandoned the children. Accordingly, this factor also favors the grant of permanent custody to FCCS.

{¶ 70} After careful review of the evidence and testimony presented at the hearing, we conclude there was competent, credible evidence to support the juvenile court's

conclusion that granting permanent custody to FCCS was in the children's best interest. Accordingly, we cannot find that the juvenile court's determination was against the manifest weight of the evidence. It is clear from the record that appellant cares for her children. However, the children are in need of permanent placement and cannot wait any longer for their mother to comply with the case plan. "The 'overriding concern' in any child custody case is to reach a disposition that is in the child's best interests." *In re B.B.* at ¶ 69, citing *In re Hitchcock*, 120 Ohio App.3d 88, 102 (8th Dist.1996).

**{¶ 71}** For the forgoing reasons, appellant's second assignment of error is overruled.

## IV. CONCLUSION

**{¶ 72}** Having overruled appellant's two assignments of error, we affirm the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch.

*Judgments affirmed.*

BEATTY BLUNT and MCGRATH, JJ. concur.

————————————