[Cite as *In re K.S.*, 2025-Ohio-1381.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| In the Matter of: | : | No. 23AP-566 |
| K.S. et al., | : | (C.P.C. No. 21JU-1913) |
| (T.S., Mother, | : | No. 23AP-627 |
|  |  | (C.P.C. No. 21JU-1941) |
| Appellant). | : | No. 23AP-628 |
|  | : | (C.P.C. No. 21JU-1929) |
|  | : | No. 23AP-629 |
|  | : | (C.P.C. No. 21JU-1918) |
|  | : | (REGULAR CALENDAR) |
|  | : |  |

D E C I S I O N

Rendered on April 17, 2025

**On brief:** *Mitchell A. Williams*, Public Defender, and *Robert D. Essex* for appellant.

**On brief:** *Tyler W. Dunham* for Franklin County Children Services.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

MENTEL, J.

{¶ 1} Appellant, T.S., mother, appeals from the August 23, 2023 decision and judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating her parental rights and granting permanent custody of the minor children, A.L., N.D., Tz.S., K.S., and N.S. ("children") to appellee, Franklin County Children Services ("FCCS"). For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} T.S. is the mother of the six children, A.L. (d.o.b. 6/12/05), L.D. (d.o.b. 9/05/08), N.D. (d.o.b. 4/7/10), Tz.S. (d.o.b. 2/03/15), K.S. (d.o.b. 9/18/16), and N.S. (d.o.b. 10/12/17), involved in this matter. On March 1, 2021, FCCS filed a complaint in juvenile court alleging A.L. was a neglected and dependent child pursuant to R.C. 2151.03(A)(2) and 2151.04(C), respectively. On the same date, FCCS filed a complaint alleging L.D. and N.D. were neglected children under R.C. 2151.03(A)(2), (A)(3) and dependent children under R.C. 2151.04(C). Also on March 1, 2021, FCCS filed a complaint alleging Tz.S, was a neglected child pursuant to R.C. 2151.03(A)(2) and a dependent child under R.C. 2151.04(C). Finally, FCCS filed a complaint alleging K.S. and N.S. were neglected children under R.C. 2151.03(A)(2), (A)(3) and dependent children under R.C. 2151.04(C). A preliminary hearing was held on March 3, 2021. At the conclusion of the hearing, the juvenile court granted FCCS temporary orders of custody ("TOC").

{¶ 3} On May 26, 2021, all parties appeared before the juvenile court for a dispositional hearing as to all four cases. T.S., despite making a general denial of the allegations, did not dispute the adjudication of the children as dependent. At the conclusion of the hearing, the TOCs were terminated, and the court granted FCCS temporary court commitments ("TCC"). Case plans were established for each parent. On December 13, 2021, FCCS filed motions that the court grant it permanent custody of the children for the purposes of adoption.

{¶ 4} On May 17 and 18, 2023, the juvenile court held a hearing on the motions for permanent custody. Prior to the start of the hearing, the parties addressed several outstanding motions. Notably, V.J., the paternal grandmother of L.D., sought legal custody of the child who had been placed with her for over two years. (May 17, 2023 Tr. at 68-70.) V.J. lives in Benton Harbor, Michigan with two 19-year-old grandchildren. (Tr. at 84, 88.) V.J. testified that she is willing to maintain custody until L.D. reaches the age of majority and, as the legal custodian, will not modify custody without a court order. (Tr. at 70.) V.J. stated that she understands that while she has legal custody of L.D., the parents will still have residual parental rights. (Tr. at 71.) V.J. testified that she has never tried to stop T.S. from visiting L.D. (Tr. at 72.) V.J. stated that her first priority is the children. (Tr. at 90.) V.J. was told that she was not permitted to take N.D. because the child was not stable. At

the conclusion of V.J.'s testimony, the juvenile court indicated it would award V.J. TOC. (Tr. at 92.) The juvenile court later awarded permanent custody to V.J. by a separate order. The parties reconvened to commence the hearing on the motions for permanent custody at which the following evidence was adduced.

{¶ 5} T.S. is the mother of the children in this matter. (Tr. at 100.) T.S. acknowledged that none of her children have lived with her since 2020. (Tr. at 103.) T.S. does not understand why her children were removed from her care. (Tr. at 103.) According to T.S., she was told the children were removed because the apartment was not a safe environment, the apartment was infested with bugs, the kids were dirty, there was a lack of food, lack of transportation, lack of financial support, and her mental and physical diagnoses. (Tr. at 104-07.) T.S. testified that there were also concerns about domestic violence, but she insisted that was only one occurrence. (Tr. at 108.) According to T.S., her case plan required her to complete assessments, drug screens, and a mental health class. (Tr. at 110.) T.S. testified that she used marijuana as recently as two days before the hearing. (Tr. at 115.) T.S. stated she has used marijuana five times in the last six months, though she intends to stop. (Tr. at 116, 118.) T.S. conceded that she used cocaine within the prior year as well as three times in three months in 2022. (Tr. at 115, 120.) T.S. has not completed AOD or substance abuse counseling. (Tr. at 122-23.) Outside the day before the hearing, T.S. does not know if she completed any other drug screens in 2023. (Tr. at 123.) T.S. has also not completed mental health counseling or engaged in any domestic violence services since her children were removed. (Tr. at 130-31.) "I don't speak to no counselors." (Tr. at 132.)[1]

{¶ 6} Regan Carey is a child protective specialist at the Buckeye Ranch. (Tr. at 133.) Carey has been T.S.'s caseworker since October 2022. (Tr. at 135.) When Carey became involved in the case, FCCS had already filed the motions for permanent custody. (Tr. at 136.) According to Carey, FCCS received custody of the children on January 23, 2020; the children have remained in FCCS' custody since that time. (Tr. at 136-37.) Carey has met

---

[1] The trial court indicated that the parties agreed to provide T.S. time to "calm down and not be on the witness stand for awhile" and allowed the next witness to testimony before T.S. had to finish her testimony. (Tr. at 224.)

with T.S. to discuss the objectives of her case plan with the goal of reunification. (Tr. at 136-38.)

{¶ 7}  As part of her case plan, T.S. was required to complete a mental health assessment, a substance abuse assessment, a domestic violence assessment, and follow through with those recommendations.  T.S. was also to complete parenting classes, obtain housing, and employment. (Tr. at 141-42.)  When Carey took over T.S.'s case, T.S. had not fully completed any elements of the case plan. (Tr. at 138.)  According to Carey, T.S. started the mental health assessment, alcohol and other drug assessment, parenting classes, and screened in July 2022. (Tr. at 138-39.)  The drug assessment was included because T.S. tested positive for marijuana and cocaine.  Carey stated that FCCS had concerns that she was using these drugs in front of the children in the home. (Tr. at 142.)  Before Carey's involvement in the case, T.S. completed one drug screen but has only completed one additional screen since that time. (Tr. at 143.)  Carey explained that T.S. did not complete the substance abuse assessment as "[t]hey take a couple of hours to complete, and sometimes get split up into multiple appointments." (Tr. at 143.)  The mental health assessment was included in the case plan because T.S. was reportedly aggressive and wanted to fight people. (Tr. at 144.)  Carey testified that T.S. does go to counseling through North Central but it is "very sporadic." (Tr. at 145.) Carey has "not been able to ascertain that [T.S.] has completed the assessment." (Tr. at 145.)  Carey noted that T.S. does speak with her counselor by telephone but mostly to discuss sleep issues. (Tr. at 145.)

{¶ 8}  Carey testified that the domestic violence assessment and treatment objective was based on multiple reports that domestic violence took place in front of the children as well as reports of weapons in the home. (Tr. at 146.)  Carey stated that T.S. started but did not complete this aspect of the case plan. (Tr. at 147.)  Carey also has domestic violence concerns regarding S.R. who currently resides with T.S. (Tr. at 147-48.)  Carey explained that S.R. is the father of T.S.'s two youngest children not at issue in this case. (Tr. at 156.)  Carey was told not to go to their residence alone based on S.R.'s aggressive behavior. (Tr. at 148.)  Currently, T.S. is receiving rental assistance through an organization called Homes for Families. (Tr. at 150.)  According to Carey, T.S. informed Homes for Families that her children were living with her, which they were not. (Tr. at 151-52.)  Carey acknowledged that T.S. informed her that she had obtained employment but did not indicate where or

provided proof. Carey testified that T.S. has never provided proof of employment since she has been on the case. (Tr. at 153.) Carey has not met, and does not know the whereabouts of, two of the alleged fathers in this case, K.B. and L.D. (Tr. at 154.) Carey did meet one of the alleged fathers, D.S., four months ago. According to Carey, they spoke and set up a meeting, but D.S. did not show up. (Tr. at 154.) Carey does not know the whereabouts of D.S. at this time. (Tr. at 155.)

{¶ 9} Visitation has been provided for the parents. None of the alleged fathers have visited the children. Carey described T.S.'s attendance for visitation as sporadic. (Tr. at 157.) T.S. will go months without missing a visitation then other months where she misses multiple visits. (Tr. at 158.) T.S. has attributed the missed visits to transportation or being sick. Carey testified that she has provided T.S. with bus passes. (Tr. at 158.)

{¶ 10} According to Carey, the results of the visits that did take place were mixed. Carey stated that when the children visited together it was not productive but when the visits were spread out between the children it was more beneficial. (Tr. at 168.) Carey noted that on multiple visits the children were running out of the room, jumping off a couch, and throwing things. (May 18, 2023 Tr. at 14.) Carey indicated that T.S. did not redirect the children and "kind of just sat back and let us do it." (Tr. at 15.) Carey testified to the children's various special needs and current placements. Carey believed that the children's special needs would make it difficult to imagine any single placement being an effective arrangement. (May 17, 2023 Tr. at 173.) Carey provided additional testimony as to the bond between the children and T.S. as well as the status of the children's current placements. There are no relatives willing or capable of taking care of the children. (Tr. at 186.) Carey testified that all the children need legally secure permanent placement and recommended that the motion for custody be granted. (Tr. at 186.)

{¶ 11} On cross-examination, Carey testified that she read all the information regarding the case when she was assigned to the matter. (Tr. at 188-89.) Carey acknowledged that T.S.'s residence is clean and there was usually food in the house. (Tr. at 190.) According to Carey, T.S. does not have beds or furniture available if the children were returned to her care. (May 18, 2023 Tr. at 13.) Carey stated that while T.S. took the pre-test and attended a few parenting classes, she never finished the course or took the post-test. (May 17, 2023 Tr. at 192.) Carey noted that while T.S. received daily bus passes, as

opposed to monthly passes, T.S. has never been denied a bus pass. (Tr. at 197.) After the conclusion of Carey's testimony, T.S. indicated she was not feeling well. The juvenile court continued the hearing until the next day. (Tr. at 228.)

{¶ 12} On May 18, 2023, the parties resumed the hearing. T.S.'s counsel stated for the record that T.S. overslept and would not appear for the hearing until later that morning. (May 18, 2023 Tr. at 11.) T.S., however, never appeared for the second day of the hearing. Stephanie Coe testified that she has been the Court Appointed Special Advocates of Franklin County for the family since July 2020. (Tr. at 29-30.) Coe is the lay guardian for the six children involved in this case as well as T.S.'s two additional children. (Tr. at 30.) Coe indicated the children have been in the continuous custody of FCCS since January 2020. (Tr. at 42-43.) Coe has not had contact with the alleged fathers. (Tr. at 45-47.) Coe testified that it is not possible at this time to recommend reunification with any of the alleged fathers. (Tr. at 47-48.)

{¶ 13} Coe's primary concerns with T.S. have involved housing, mental health, substance use, and domestic violence counseling. (Tr. at 48.) Coe stated that while T.S. was the victim of domestic abuse, Coe was also concerned with T.S.'s behavior toward the children. (Tr. at 49.) Coe testified that T.S. has not participated in the children's school meetings or taking the children to medical appointments. (Tr. at 49.) According to Coe, T.S. does not believe the children need additional services. (Tr. at 50.) Coe stated that T.S. has not had stable housing during the life of the case. (Tr. at 52.) T.S. has recently obtained housing through a program that pays her rent for a year.

{¶ 14} According to Coe, T.S. has never consistently maintained employment. (Tr. at 52.) Coe has requested income information from T.S. throughout the case, but T.S. only provided one paystub in the summer of 2021. (Tr. at 66.) Coe testified that while she has been inside T.S.'s residence, she was not allowed upstairs. (Tr. at 59.) Coe noted that S.R. lives with T.S. and has his own case plan. (Tr. at 62.) Coe indicated that S.R. has failed to progress in his case plan as well. (Tr. at 63.) Coe expressed concerns as to S.R. 's substance use and criminal activity. (Tr. at 64.) Coe has had concerns about T.S.'s mental health and substance abuse during the life of the case. (Tr. at 67.) Coe testified that while T.S. started the Syntero assessment, a dual substance abuse and mental health diagnoses, she never followed through. (Tr. at 70.) Coe described instances of T.S. physically disciplining the

children, which Coe believes constitutes domestic violence. (Tr. at 101, 103.) Coe testified, based on her experience, that she does not believe T.S. will ever progress with the needed services. (Tr. at 74.)

{¶ 15} Coe testified that T.S. has not consistently attended visits during the case. (Tr. at 118.) According to Coe, T.S. regularly attended visits with her children through 2020. (Tr. at 119.) From 2021 into the summer of 2022, T.S.'s visits became very inconsistent. (Tr. at 119.) Prior to the most recent visit, T.S. had missed three visits in a row. (Tr. at 120-21.) Coe testified to the varying bonds between the children and their placements. Coe believes the motion for permanent custody should be granted as to all the children. (Tr. at 135.)

{¶ 16} On cross-examination, Coe acknowledged that others could have observed more of a bond between T.S. and the children. (Tr. at 143.) Coe noted, other than dancing with the three older girls, she could not think of a single instance in which T.S. stood up or got off the couch where she was sitting. (Tr. at 148.) Coe acknowledged that she has not attended every visit, and it is possible that another observer documented something different. (Tr. at 149.) Coe also acknowledged that T.S.'s current home is appropriate from the perspective of utilities, food, and cleanliness but there are no beds, toys, or "anything for the children in the home." (Tr. at 176.) According to Coe, T.S. does not believe the children need any services or help from FCCS. (Tr. at 180.) Coe stated that T.S. has never participated in any IEP meetings though Coe acknowledged that she cannot say that T.S. has been notified every time. (Tr. at 181.) Coe also acknowledged that T.S. started parenting classes but does not know how many she attended. (Tr. at 190.) According to Coe, T.S. never began, let alone completed, mental health counseling. (Tr. at 191.) Coe conceded that T.S. has always wanted her children returned. However, Coe stated that the next step for T.S. was working on the case plan, which she has "not seen any evidence of that in three and a half years." (Tr. at 199-200.) Coe testified that she believes FCCS has done everything possible to provide T.S. and the family with services. (Tr. at 219.) Coe did express concerns as to how FCCS handled the placements of the children during the life of the case. (Tr. at 220.) Coe has "no doubt" that it would be in the children's best interest to grant the motion for permanent custody. (Tr. at 224.)

{¶ 17} At the conclusion of Coe's testimony, FCCS rested its case. Counsel for T.S. did not present evidence as T.S. never appeared for the second day of the hearing. (Tr. at 230.) After asking if the parties had rested their case, the juvenile court summarized its findings and indicated that it would grant the motions. (Tr. at 231.) The court then inquired whether there was anything else. None of the parties affirmatively indicated that they had anything further to discuss. (Tr. at 232.)

{¶ 18} In its August 23, 2023 decision and judgment entry, the juvenile court granted the motions for permanent custody terminating the parental rights of T.S. and the alleged fathers. T.S. filed a timely appeal. The matters were consolidated for the purposes of appeal.

## II. ASSIGNMENT OF ERROR

{¶ 19} T.S. submits the following assignment of error:

> The trial court committed plain error to the prejudice of the appellant when it did not permit appellant's counsel to make a closing argument depriving her of her right to the effective assistance of counsel and her right to Due Process under the Fourteenth Amendment and Article I, Section 16 of the Ohio Constitution.

## III. LEGAL ANALYSIS

### A. T.S.'s Sole Assignment of Error

{¶ 20} T.S. argues that the juvenile court committed plain error by not allowing counsel to make a closing argument violating her due process rights under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

{¶ 21} The Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution protect an individual's right to parent one's child. *In re T.N.*, 2022-Ohio-2784, ¶ 45 (10th Dist.), citing *In re H.S.*, 2022-Ohio-506, ¶ 47 (10th Dist.), citing *In re L.W.*, 2018-Ohio-2099, ¶ 6 (10th Dist.). The Supreme Court of Ohio has held that it is an essential and basic right of a parent to raise their own child. *In re K.R.*, 2023-Ohio-359, ¶ 11 (10th Dist.), citing *In re Murray*, 52 Ohio St.3d 155, 157 (1990). "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' . . . Therefore, parents 'must

be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991).

{¶ 22} However, the right of a parent to raise their own child is not absolute and is subject to the ultimate welfare of the child. *In re C.W.*, 2025-Ohio-282, ¶ 35 (10th Dist.), citing *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). In certain circumstances, therefore, the state may terminate the parental rights of natural parents when such termination is in the child's best interest. *C.W.* at ¶ 35, citing *Cunningham* at 105.

{¶ 23} In the case sub judice, the juvenile court, after asking if the parties had rested their case, summarized its findings and indicated that it would grant the motions for permanent custody. (Tr. at 231.) The court then asked if there was anything else, which none of the parties affirmative indicated they had anything more to discuss. (Tr. at 232.) At no point did T.S.'s counsel attempt to provide a closing argument or raise an objection that the juvenile court had deprived her of the opportunity to make a closing argument. Because T.S. did not object or raise this issue with the juvenile court, we are limited to whether the lack of closing arguments in this instance constituted plain error.

{¶ 24} In civil matters, "the plain error doctrine is not favored and may only be applied in the extremely rare case involving exceptional circumstances such that the error, if left uncorrected, would challenge the fairness, integrity, or public reputation of the judicial process itself." (Internal quotation omitted.) *In re A.S.*, 2022-Ohio-1861, ¶ 54 (10th Dist.), citing *Brisco v. U.S. Restoration & Remodeling, Inc.*, 2019-Ohio-5318, ¶ 25 (10th Dist.); *see also State v. Morgan*, 2017-Ohio-7565, ¶ 40, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121 (1997) (writing that "[a]s when they apply criminal plain-error review, reviewing courts applying civil plain-error review 'must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice' "). "A 'plain error' is one that is 'obvious and prejudicial although neither objected to nor affirmatively waived.' " (Further quotation and citation omitted.) *J.M.R. v. M.D.O.*, 2024-Ohio-5693, ¶ 11 (10th Dist.). This court has explained that as parental rights determinations are difficult to make, and reviewing courts provide wide latitude to the trial court's findings of evidence in such cases, " ' "[p]lain error is particularly difficult to establish." ' " *A.S.* at ¶ 54, quoting *Hamilton*

*v. Hamilton*, 2016-Ohio-5900, ¶ 8 (10th Dist.), quoting *Faulks v. Flynn*, 2014-Ohio-1610, ¶ 20 (4th Dist.), quoting *Robinette v. Bryant*, 2013-Ohio-2889, ¶ 28 (4th Dist.).

{¶ 25} The Supreme Court has addressed a similar issue in the criminal context. *See State v. McCausland*, 2009-Ohio-5933. In *McCausland*, the defendant was charged with speeding, operating a vehicle under the influence of alcohol, and refusal of a chemical test with a prior conviction within 20 years. *Id.* at ¶ 2. The defendant, represented by counsel, withdrew his jury demand, and the parties proceeded with a bench trial. *Id.* After the presentation of evidence, neither defense counsel nor the state sought the opportunity to present a closing argument. *Id.* at ¶ 3. The trial court proceeded to summarize the evidence and found the defendant guilty on all three charges. *Id.* On appeal, the defendant argued that the trial court denied him a fair trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution when it denied counsel the opportunity to present a closing argument. *Id.* at ¶ 4. The Twelfth District Court of Appeals affirmed the trial court, and the Supreme Court of Ohio accepted the matter as a discretionary appeal. *Id.*

{¶ 26} The *McCausland* court first noted that the United States Supreme Court considered the significance of closing arguments in a criminal case in *Herring v. New York*, 422 U.S. 853 (1975). *Herring* concerned a New York statute that allowed a trial court judge to deny the opportunity for closing arguments in a bench trial. *Herring* at 853-54. In *Herring*, the defense counsel expressly requested a closing argument, which the trial court denied. *Id.* at 859. The *Herring* court reversed the lower court decision writing:

> There can be no doubt that closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial. Accordingly, it has universally been held that counsel for the defense has a right to make a closing summation to the jury, no matter how strong the case for the prosecution may appear to the presiding judge. The issue has been considered less often in the context of a so-called bench trial. But the overwhelming weight of authority, in both federal and state courts, holds that a total denial of the opportunity for final argument in a nonjury criminal trial is a denial of the basic right of the accused to make his defense.

*Herring* at 858-59.

{¶ 27} The *McCausland* court declined to extend the holding in *Herring* to "create a presumption against waiver when a closing argument is neither requested by the defense

nor objected to when omitted by the court." *McCausland* at ¶ 10. The *McCausland* court distinguished *Herring* as it concerned a specific statute that affirmatively allowed the trial court to deny a defendant the opportunity to present a closing argument when requested. *Id.* at ¶ 10.

{¶ 28} The instant case is analogous to *McCausland* in two important respects. As was the case in *McCausland*, counsel for T.S. did not expressly request a closing argument or object to the juvenile court's omission of closing arguments at any point of the hearing. Thus, there is no evidence that the juvenile court denied T.S.'s counsel the opportunity to present a closing argument. While T.S. has acknowledged that trial counsel did not object to the lack of closing arguments, she contends that the juvenile court committed plain error by failing to solicit closing arguments from the parties. However, we cannot find the juvenile court committed plain error as there is no indication that the outcome of the hearing would have been different had closing argument taken place.

{¶ 29} R.C. 2151.414 controls the termination of parental rights. *C.W.*, 2025-Ohio-282, at ¶ 36, citing *In re K.H.*, 2008-Ohio-4825, ¶ 42. As set forth in R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to a children services agency if the juvenile court determines, by clear and convincing evidence, "(1) one of the five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies; and (2) it is in the best interest of the child to do so." *C.W.* at ¶ 36, citing *In re Z.C.*, 2023-Ohio-4703, ¶ 7. If the first part of R.C. 2151.414(B)(1) is satisfied, R.C. 2151.414(D) provides multiple avenues for the juvenile court to determine if the grant of permanent custody of the child to FCCS is in their best interest. Under R.C. 2151.414(D)(1), the juvenile court must consider all relevant factors including, but not limited to, (D)(1)(a) through (e) to determine whether it is in the child's best interest to grant permanent custody to the agency. R.C. 2151.414(D)(2) provides an alternative to (D)(1) in order to reach a best-interest determination. *In re M.K.*, 2010-Ohio-2194, ¶ 22 (10th Dist.). R.C. 2151.414(D)(2) directs:

> If all of the following apply, permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency:
>
> (a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be

placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

{¶ 30} Stated another way, if a juvenile court finds the above four factors applicable, "granting permanent custody to FCCS is per se in the best interest of the child." *In re J.R.*, 2018-Ohio-1474, ¶ 41 (10th Dist.); *In re M.P.*, 2010-Ohio-5877, ¶ 35 (10th Dist.) ("R.C. 2151.414(D)(2) sets forth the circumstances under which a trial court is required to grant permanent custody, while the court employing the factors in R.C. 2151.414(D)(1) considers them to determine whether the best interests of the children are served in granting the permanent custody motion.").

{¶ 31} As to the first part of the analysis, we find that R.C. 2151.414(B)(1)(d) is easily satisfied. T.S. stated that none of her children have lived with her since 2020. (May 17, 2023 Tr. at 103.) According to Carey, FCCS received custody of the children on January 23, 2020, and the children have remained in their custody since that time. (Tr. at 136-37.) Coe also confirmed that the children have been in the continuous custody of FCCS since January 2020. (Tr. at 42-43.) As such, the record reflects the children have been in the custody of FCCS for a period of 12 or more months of a consecutive 22-month period.

{¶ 32} Next, we must determine if it is in the children's best interest to grant the motions for permanent custody. Because we find our resolution of R.C. 2151.414(D)(2) dispositive, we will begin our analysis with those factors. As to R.C. 2151.414(D)(2)(a), we find division (E)(10) of this section is satisfied as there is no dispute that the alleged fathers have abandoned the children in this case. As for T.S., we find an examination of R.C. 2151.414(E)(1) more appropriate. R.C. 2151.414(E)(1) provides:

Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency

to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶ 33} The record reflects that upon the placement of the children outside the home, T.S. failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the home. This is most evident in T.S.'s failure to comply with the case plan.

{¶ 34} During the hearing, T.S. testified that she was told the children were removed because the apartment was not a safe environment, the apartment was infested with bugs, the kids were dirty, there was a lack of food, lack of transportation, lack of financial support, and her mental and physical diagnoses. (Tr. at 104-07.) Carey testified that she met with T.S. and discussed the objectives of her case plan. (Tr. at 138.) According to Carey, the case plan for T.S. had the goal of reunification. (Tr. at 137.) T.S. was required to complete a mental health assessment, a substance abuse assessment, a domestic violence assessment, and to follow through with those recommendations. T.S. was also to complete parenting classes, obtain housing, and employment. (Tr. at 141-42.)

{¶ 35} When Carey took over the case, T.S. had not fully completed any elements of the case plan. (Tr. at 138.) Concerning the substance abuse component, Carey testified that the drug assessment was included because T.S. tested positive for marijuana and cocaine and there were concerns that she was using these drugs in front of the children in the home. (Tr. at 142.) Carey explained that T.S. did not complete the substance abuse assessment as "[t]hey take a couple of hours to complete, and times get split up into multiple appointments." (Tr. at 143.) T.S. testified that she used marijuana as recently as two days before the hearing. (Tr. at 115.) T.S. stated that she has used marijuana five times in the last six months, but she intends to quit. (Tr. at 116, 118.) T.S. also stated that she used cocaine within the prior year. (Tr. at 115.) T.S. admitted that she used cocaine three times in three months in 2022. (Tr. at 120.) Prior to Carey's involvement in the case, T.S.

completed one drug screen but has only completed one additional screen since that time. (Tr. at 143.) T.S. has not completed AOD or substance abuse counseling. (Tr. at 122-23.)

{¶ 36} A mental health assessment was included in the case plan because T.S. was reportedly aggressive and wanted to fight people. (Tr. at 144.) Coe has had concerns about T.S.'s mental health and substance abuse throughout the life of the case. (Tr. at 67.) Coe testified that T.S. never began, let alone completed, mental health counseling. (Tr. at 191.) Coe testified that while T.S. started the Syntero assessment, a dual substance abuse and mental health diagnoses, she never followed through. (Tr. at 70.) Carey testified that T.S. does go to counseling through North Central but it is "very sporadic," and Carey has "not been able to ascertain that [T.S.] has completed the assessment." (Tr. at 145.) T.S. acknowledged that she did not complete mental health counseling. (Tr. at 130.)

{¶ 37} Carey testified that T.S. was required to complete a domestic violence assessment and treatment as part of the case plan. Carey explained that this component was based on multiple reports that domestic violence occurred in the home in front of the children as well as reports of weapons in the home. (Tr. at 146.) Coe noted that while T.S. was the victim of domestic abuse, Coe was also concerned with T.S.'s behavior toward the children. (Tr. at 49.) Coe described instances of T.S. physically disciplining the children, which Coe believed constituted domestic violence. (Tr. at 101, 103.) Carey stated that while T.S. took the pre-test and attended a few parenting classes, she never finished the course or took the post-test. (Tr. at 192.) T.S. has also not engaged in any domestic violence services since her children were removed. (Tr. at 131.) "I don't speak to no counselors." (Tr. at 132.)

{¶ 38} As for housing, T.S. has not had stable housing during the life of the case. (May 18, 2023 Tr. at 52.) T.S. is currently residing in a duplex and is receiving rental assistance through an organization called Homes for Families. (May 17, 2023 Tr. at 150.) The program will pay her rent for a year. According to Carey, T.S. had informed Homes for Families that her children were living with her, which they were not. (Tr. at 151-52.) According to Carey, T.S. does not have beds or furniture available if the children were returned to her care. (May 18, 2023 Tr. at 13.) Carey did acknowledge that T.S.'s residence is clean and there was usually food in the house. (May 17, 2023 Tr. at 190.) Coe also conceded that T.S.'s current home is appropriate from the perspective of utilities, food, and

cleanliness but there are no beds, toys, or "anything for the children in the home." (May 18, 2023 Tr. at 176.)

{¶ 39} Concerning employment, Carey testified that T.S. has never provided proof of employment since she has been on the case. (Tr. at 153.) Carey acknowledged that T.S. informed her on the first day of the hearing that she obtained employment. However, T.S. did not state where or provide documentation. According to Coe, T.S. has never consistently maintained employment for any period of time. (Tr. at 52.) Coe testified that she has requested income information from T.S. during the case and received only one paystub in the summer of 2021. (Tr. at 66.)

{¶ 40} Visitation has been provided for the parents. Carey described T.S.'s attendance for visitation as sporadic. (Tr. at 157.) T.S. will go months without missing a visitation then other months where she misses multiple visits. (Tr. at 158.) T.S. attributed the missed visits to transportation or being sick. Carey, however, testified that she has provided T.S. with bus passes. (Tr. at 158.) Prior to the most recent visit, T.S. had missed three visits in a row. (Tr. at 120-21.) According to Carey, when the children visited together it was not productive but when the visits were spread out between the children it was more beneficial. (Tr. at 168.) Carey noted that on multiple visits the children were running out of the room, jumping off a couch, and throwing things. (May 18, 2023 Tr. at 14.) Carey stated that T.S. did not redirect the children and "kind of just sat back and let us do it." (Tr. at 15.)

{¶ 41} Coe, based on her experience, does not believe T.S. will ever progress with the needed services. (Tr. at 74.) Coe acknowledged that T.S. has always wanted her children returned. However, Coe stated that the next step for T.S. was working on the case plan, which she has "not seen any evidence of that in three and a half years." (Tr. at 199-200.) Given T.S.'s continuous and repeated failure to substantially remedy the conditions causing the child to be placed outside the child's home, R.C. 2151.414(E)(1) is met. Additionally, it is apparent from the record the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent. For the foregoing reasons, R.C. 2151.414(D)(2)(a) is satisfied.

{¶ 42} R.C. 2151.414(D)(2)(b) is also met as the children have been in the custody of FCCS for over two years and no longer qualify for temporary custody. Next, R.C.

2151.414(D)(2)(c) is satisfied as the children do not meet the requirements for planned permanent living arrangement ("PPLA") pursuant to R.C. 2151.353(A)(5). Of note, while A.L. is age-eligible for PPLA, the juvenile court found, which we agree, PPLA inappropriate as A.L. desired to be adopted by her foster family. (May 17, 2023 Tr. at 176.) Coe testified that "[A.L.]'s frustration has been, she turns 18 in June of this year, and she wanted to be adopted before that happened. And her foster parents have assured her that if they can do it, they will." (May 18, 2023 Tr. at 77.) At the close of the case, counsel even went as far as to ask the juvenile court to make every effort to issue the decision prior her A.L.'s birthday. (Tr. at 232.) We agree with the trial court that the requirements for PPLA are not met under the statute and, given the foster parent's willingness to adopt A.L., is not in her best interest. Finally, R.C. 2151.414(D)(2)(d) is satisfied as there are no relatives or other interest persons that have filed or been identified in, a motion for legal custody of the children. (Tr. at 186.) While S.W. filed a motion to add a party and motion for custody on December 22, 2022, these motions were dismissed for lack of prosecution as S.W. failed to appear for the hearing demonstrating her lack of desire to pursue custody. (Tr. at 58.) Given all of the R.C. 2151.414(D)(2) factors are met, the juvenile court was required to find the grant of the motions for permanent custody were in the best interest of the children. We find that no plain error exists because there was no indication that the outcome of this matter would have been different had T.S.'s counsel made a closing argument. Any error from the lack of closing arguments, in this case, was harmless.

{¶ 43} Despite our conclusion that there was no plain error in this instance, we are troubled that the juvenile court failed to engage in such a basic part of the hearing process. We have admonished the juvenile court on two prior occasions for providing an oral pronouncement of judgment without asking whether the attorneys intended to engage in closing arguments. *See In re Williams*, 2001 Ohio App. LEXIS 1247, *11-12 (10th Dist. Mar. 20, 2001) ("We are likewise troubled by the [juvenile] court's decision to render an oral pronouncement of judgment at the close of the hearing without allowing the attorneys an opportunity to engage in closing argument or a summation of the evidence . . . we believe that the [juvenile] court's failure to ask whether the attorneys wanted to engage in argument is a further example of the unsettling informality that permeated this proceeding."). *In re J.W.*, 2019-Ohio-4775, ¶ 36 (10th Dist.) ("we are concerned by the fact that the trial court

orally pronounced its judgment at the close of the hearing without affording counsel the opportunity to present closing arguments"). Again, we reiterate the better practice is for the juvenile court to ask whether the attorneys intend to present closing arguments prior to rendering an oral pronouncement of judgment.

{¶ 44} For the forgoing reasons, T.S.'s sole assignment of error is overruled.

## IV. CONCLUSION

{¶ 45} Having overruled T.S.'s sole assignment of error, we affirm the judgment of the juvenile court as to the termination of her parental rights and permanently divesting her of any and all parental rights, privileges, and obligations.

*Judgment affirmed.*

DORRIAN and BOGGS, JJ. concur.

_____