**[Cite as *In re B.N.*, 2026-Ohio-419.]**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the matter of: | : | |
| [B.N., Jr., | : | No. 23AP-681 |
| | | (C.P.C. No. 19JU-13956) |
| B.N., Sr., | : | (REGULAR CALENDAR) |
| Appellant]. | : | |

---

D E C I S I O N

Rendered on February 10, 2026

---

**On brief:** *Robert J. McClaren*, for Franklin County Children
Services. **Argued:** *Robert J. McClaren*.

**On brief:** *Mitchell A. Williams*, Public Defender, and
*Timothy E. Pierce*, for appellant. **Argued:** *Timothy E. Pierce*.

---

APPEAL from the Franklin County Court of Common Pleas
Division of Domestic Relations and Juvenile Branch

JAMISON, J.

{¶ 1} Appellant, B.N., Sr., father of the minor child, B.N., Jr., appeals the decision of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch, granting permanent custody of B.N., Jr. to Franklin County Children Services ("FCCS"), a public children services agency. For the reasons below, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} B.N., Jr. was born on or about November 29, 2019. On December 6, 2019, FCCS filed a complaint alleging that B.N., Jr. was an abused, neglected, and dependent child. In that complaint, FCCS alleged that at birth, B.N., Jr.'s cord blood was positive for cocaine. B.N., Jr. also appeared to be suffering from withdrawals. During a prenatal visit in July of 2019, B.N., Jr.'s mother, H.S., tested positive for cocaine and oxycodone. The

complaint further alleged that appellant refused to engage with the FCCS caseworker. Paternity of B.N., Jr. was never established, and appellant is the alleged father.

{¶ 3} After a preliminary hearing on December 9, 2019, temporary emergency custody was granted to FCCS. At that hearing, the magistrate asked the mother if she was a member of a Native American tribe, and she stated that she was not. The trial court appointed Thomas Waldeck as guardian ad litem ("GAL") for B.N., Jr.

{¶ 4} On February 25, 2020, an adjudication hearing was held in this matter. Appellant was not present at the hearing. Following the hearing, by agreement of the parties, the trial court dismissed the neglect and dependency allegations, but adjudicated B.N., Jr. an abused child. FCCS was awarded temporary custody of B.N., Jr.

{¶ 5} On February 26, 2020, Waldeck submitted a GAL report indicating that the mother made recent progress on her case plan. He noted that appellant refused to participate in any ongoing case plan services.

{¶ 6} In a case plan dated March 2, 2020, goals were listed for appellant. Those goals included: random drug screens; completion of an alcohol and drug assessment and following through with all recommendations; completion of a domestic violence assessment and following through with all recommendations; signing releases of information; participating in a parenting program; consistently exercising visitation with B.N., Jr.; and meeting regularly with the caseworker.

{¶ 7} On September 30, 2020, FCCS filed for its first extension of temporary custody. In its motion, FCCS noted that appellant was participating in case plan services. He completed an alcohol and drug assessment and recently began parenting classes. His drug screens were consistently positive, and he was linked with Guidestone of Ohio for treatment.

{¶ 8} Following a hearing held on December 16, 2020, the trial court granted FCCS's motion for an extension of temporary custody. Appellant was present for that hearing. FCCS filed a motion for its second extension of temporary custody on April 12, 2021. In that motion, FCCS alleged that appellant was removed from the Guidestone drug treatment program due to non-compliance. FCCS still had concerns about domestic violence in the home and appellant's drug usage.

{¶ 9}   A hearing was held on FCCS's motion on June 2, 2021.  Appellant was in attendance.  Following the hearing, the trial court granted FCCS's motion.

{¶ 10}  Waldeck submitted a GAL report on July 9, 2021.  In that report, he noted that B.N., Jr. was placed in a foster home with his sister.  B.N., Jr. appeared well cared for and happy.  B.N., Jr. appeared to be developing normally and there were no concerns as to delays.

{¶ 11}  On September 17, 2021, FCCS filed a motion for permanent custody of B.N., Jr.  Waldeck submitted another report on October 13, 2022.  In that report, he noted that B.N., Jr. was now two years old and "ha[d] no understanding of the concept of permanence."  (Oct. 13, 2022 Report of GAL at 1.)  Waldeck also expressed optimism regarding recent case plan progress by H.S.  He recommended that the trial court grant continuance of the permanent custody hearing in the hopes that B.N., Jr. could be reunified with H.S.

{¶ 12}  Another GAL report was filed on February 23, 2023.  Again, the report stated that B.N., Jr. was three years old and had "no understanding of the concept of permanence." (Feb. 23, 2023 Report of GAL at 1.)  The report added that B.N., Jr. had "no meaningful understanding of the legal proceedings pertaining to his custody." *Id*. at 8.  The optimism Waldeck expressed in his previous report was unfortunately proven wrong.  Since the fall of 2022, H.S. abandoned her stable housing, broke off contact with FCCS, and stopped visiting B.N., Jr.  During this time there was also a domestic violence incident between H.S. and appellant.

{¶ 13}  As for appellant, the report indicated that he completed parenting classes but had not completed the domestic violence portion of his case plan.  In Waldeck's opinion, appellant failed to maintain stable housing to meet the needs of B.N., Jr.  It was noted that appellant appeared bonded with B.N., Jr and consistently attended visitation.  At the time of the report, appellant had pending charges in Franklin County Municipal Court for domestic violence and violating a protection order.  The alleged victim in both cases was H.S.

{¶ 14}  Waldeck recommended that the trial court grant FCCS's motion for permanent custody.  The final GAL report was filed on June 8, 2023.  The only new information contained in that report was that appellant completed a domestic violence

assessment which recommended counseling. Appellant allegedly refused to complete the counseling and instead intended to seek an assessment from a different provider. Additionally, appellant's domestic violence charge was dismissed in exchange for his guilty plea to criminal mischief, amended from violating a protection order. As a result, he was placed on probation.

{¶ 15} The permanent custody hearing in this matter was held over several non-consecutive days beginning June 15, 2023. H.S. was not present for any of the trial dates. Prior to taking testimony, H.S.'s attorney stated that H.S. was "in support of [FCCS]'s motions as long as the child stays where the child's [sic] currently placed and does not want any type of custody reverting to [appellant]." (June 15, 2023 Tr. at 8.)

{¶ 16} Appellant testified that he was present at B.N., Jr.'s birth but was unable to see him for the first nine months due to COVID. B.N., Jr. never lived with appellant. Appellant indicated that for a period of time, H.S. was having home visits with B.N., Jr. H.S. was lying to FCCS about appellant living with her, so appellant would be present during those home visits. Appellant admitted he also lied to the caseworker about where he was living.

{¶ 17} Since December of 2022, appellant resided in a home on South Amherst Avenue in Columbus. He rented a basement in the home for $250 per month from a friend, V.T. He did not have a lease. He testified that V.T. could ask him to leave at any time, but she would not do that. Two other relatives of V.T. lived in the home. It should be noted that V.T. suffers from health issues that do not allow her to leave her bed, which is in the living room. Appellant admitted that other people occasionally sleep in the basement under a similar arrangement. Appellant testified that there was an exit door from the basement, and he did not have much furniture there, only a couple of chairs. If B.N., Jr. were to reside with him, B.N., Jr. would sleep in the dayroom in the basement, while appellant would sleep in the bedroom. Appellant testified that he did not have daycare in place for B.N., Jr. but V.T.'s sister could provide care for B.N., Jr. He did not know much about V.T.'s sister. In March 2023, appellant indicated that he was setting up a different place to live.

{¶ 18} Appellant testified that he did "a little bit of everything" for work. (June 15, 2023 Tr. at 19.) This included working on cars and selling "stuff" on the internet. *Id.* He did not have an employer but alleged that he and a friend had contracts with junk yards.

For a period of time in 2022 he worked at AutoZone. He quit that job because dealing with customers was too stressful. Appellant estimated that he makes "a couple thousand [dollars] a month." *Id*. at 20.

{¶ 19} When asked about his alcohol and drug assessment, appellant admitted that he was diagnosed with opiate use disorder, severe with sustained remission, and cannabis use disorder, mild. Appellant testified that he did not take it too seriously because it was based on lies. As for his drug screens, he testified that he knew he had "some dirty urine." *Id*. at 49. He indicated that he tested positive for cocaine. He admitted that his drug screen in April 2022 was positive for methamphetamines and opioids but denied using either substance. Appellant was in suboxone treatment at Lighthouse at that time. Appellant denied having problems with drugs or alcohol.

{¶ 20} Appellant did not believe he needed to complete the domestic violence assessment because every allegation against him was lies. With regards to the charges pending during the timeframe of the permanent custody proceedings, appellant pled guilty to criminal mischief, as amended from the charge of violating a protection order. The other charges were dismissed. Appellant testified he only pled guilty to get his ankle monitor removed. At the time of the permanent custody hearing, he was on probation. Appellant testified that the domestic violence assessment was part of his case plan beginning March 2020, and he completed the assessment at Natasha's House in March 2023. He completed another assessment at Afrocentric Personal Development Shop ("Afrocentric"). Appellant testified that his counseling started the day after the hearing. Appellant did not believe that domestic violence counseling would have any impact on his ability to parent B.N., Jr.

{¶ 21} Appellant completed parenting classes in 2021. When asked what he learned from those classes, he stated as follows:

> Oh, okay. It's a lot you could learn, but none of this - - it's been so long but ain't [sic] really did - - nothin' [sic] to tell you about a kid you don't know. They just tell you how their brain develops, this and that, you know what I mean. But I learned a lot of valuable stuff as far as kids learning and all that. But other than that, I - - it's common sense to me to take care of a child.

(June 15, 2023 Tr. at 80.) Later in his testimony about what he learned during parenting classes, appellant testified, "I don't know, I truly can't tell you learned, 'cause [sic] I didn't learn nothin' [sic] to be honest with you." *Id*. at 82.

{¶ 22} At the time of the hearing, appellant was ordered to have supervised visitation with B.N., Jr. once per week for one hour at a time. He consistently attended those visitations. Appellant testified that the visits with B.N., Jr. were fun. B.N., Jr. called appellant and his foster father "dad." *Id.* at 96. Appellant testified that this is because B.N., Jr. was confused and was just starting to talk. Appellant testified that he and B.N., Jr. are bonded. B.N., Jr. was also bonded with his sister, who lived with him at his foster home.

{¶ 23} Teresa Babb was the ongoing FCCS caseworker in this matter. Babb testified that appellant was added to the case plan in January 2020. Appellant's case plan objectives were to complete random drug screens, complete an alcohol and drug assessment and follow any recommendations, complete a domestic violence assessment and follow any recommendations, sign releases of information, participate in a parenting class, visit consistently with B.N., Jr., and meet monthly with the caseworker. Babb investigated potential placements for B.N., Jr. from the families of both H.S. and appellant, but never identified a willing, appropriate kinship placement.

{¶ 24} B.N., Jr. was placed in his current foster home in June 2021. Those foster parents expressed an interest in adopting B.N., Jr. His oldest sister also resided in that foster home. B.N., Jr. was bonded with his foster parents. He referred to them as mom and dad.

{¶ 25} Babb testified that B.N., Jr. never resided with appellant. At the beginning of the case, Babb had very little contact with appellant. Babb testified that until recently, appellant was not compliant in contacting her every month. Appellant signed releases of information. Since visitation began between appellant and B.N., Jr., appellant consistently attended those visitations. FCCS activity logs indicated that at times, appellant would smell strongly of marijuana at his supervised visits with B.N., Jr. Appellant also completed a parenting class through Father 2 Father. He was subsequently referred to Guidestone to be assigned a parent mentor, but he removed himself due to non-compliance.

{¶ 26} In December 2022, appellant moved into a home on South Amherst Drive. Appellant did not share with Babb anything about his financial situation, but she believed he was helping pay for things in the home. V.T. told Babb that appellant and B.N., Jr. would have a place to stay there. V.T. was a former girlfriend of appellant, and they had a child together who was now an adult. V.T. was bedridden and stayed in a hospital bed in what

would be the living room with her breathing equipment. Babb observed an empty room on the first floor of the home that was intended to be B.N., Jr.'s room. Babb never observed the basement where appellant stayed because she did not feel safe accompanying him into the basement. This was due to outbursts she observed. Ultimately, Babb did not believe that appellant's current living situation was independent, stable housing.

{¶ 27} Appellant never provided Babb with documentation regarding his income. He told her that he worked at an auto parts store for a period of time and sold items such as toys and sports cards online. At the time of the hearing, Babb did not have any information to conclude that appellant had legal and stable income to provide for B.N., Jr.

{¶ 28} Appellant completed multiple alcohol and drug assessments throughout the pendency of the case. His latest assessment, through Lighthouse, recommended outpatient suboxone with Medication Assisted Treatment ("MAT") therapy. Appellant was diagnosed with opiate use disorder, severe, and cannabis use disorder, mild. Babb was never provided with any documentation that appellant successfully completed the recommendations from his Lighthouse assessment.

{¶ 29} Babb testified that appellant consistently submitted to drug screens. Initially, it should be noted that appellant had a medical marijuana license and a prescription for suboxone. At the beginning of the case, the results of his drug tests were positive for marijuana, cocaine, and another medication. Appellant tested positive for cocaine 14 times during 2020 and 2021. Appellant submitted to a hair follicle test in April 2022 that was positive for methamphetamine, benzodiazepines, cocaine, and marijuana. During her testimony, Babb stated that it was her understanding that hair follicle tests can go back as far as six months. It was also her understanding that cocaine metabolizes more quickly than other drugs. During cross-examination and redirect, Babb questioned the validity of appellant's random urine drug screens. Ultimately, Babb testified that she was not certain of appellant's sobriety.

{¶ 30} Appellant completed a domestic violence assessment through Natasha's House in March 2023. It was recommended that he participate in a 26-week batterer's intervention program. Babb testified that appellant did not believe Natasha's House had accurate information, so he completed another domestic violence assessment through Afrocentric. Babb did not have any information regarding any recommendations from that

assessment and whether appellant was following through with them. Babb opined that completion of the domestic violence objective was the most crucial portion of appellant's case plan.

{¶ 31} Waldeck testified that he considered whether B.N., Jr. was able to make his wishes known. In response to the question as to whether he believed B.N., Jr. was too young to understand what permanency means, Waldeck responded, "he has no concept of what is happening here." (Aug. 10, 2023 Tr. at 13.) Waldeck was subsequently asked whether he believed B.N., Jr. wished to stay in his foster home. His response is as follows:

> You know, actually his wishes - - I don't think I can speak to his wishes because I think he can articulate wishes. I can tell you that he appears to be happy where he is. He appears to be bonded with the foster mother and the foster father. He refers to them as...mom and dad. So, he seems to be integrated into that household. He certainly appears to be receiving excellent care and treatment. He seems to be happy there.

*Id.* at 13-14. Later on in his testimony, Waldeck opined that B.N., Jr. was too young for counseling because he was not sufficiently verbal. Waldeck testified that B.N., Jr. did not have any special needs or delays.

{¶ 32} Waldeck testified that according to a document from Afrocentric, appellant was assessed and admitted to ongoing domestic violence classes. However, appellant was terminated from the program due to four consecutive absences. Waldeck was able to observe appellant's living space. He described it as a typical unfinished basement, a portion of which was being used for storage. There was a space in a corner with a mattress and toiletries on the floor. Appellant stayed in that part of the basement. At the time of his visit, Waldeck met another, unknown individual who appeared to be living in the basement. Waldeck opined that the basement was not a safe or appropriate place for B.N., Jr. to reside. However, Waldeck believed that the room on the first floor could be made adequate for B.N., Jr. He also testified that the living room area probably was not safe for V.T. and B.N., Jr. Ultimately, Waldeck testified that he believed granting FCCS's motion for permanent custody was in B.N., Jr.'s best interest.

{¶ 33} After the permanent custody hearing concluded, but before the trial court reached a decision, a hearing was held on the issue of the Indian Child Welfare Act ("ICWA"). At the hearing, the attorney for FCCS indicated that FCCS inquired upon

B.N., Jr.'s removal as to whether H.S. had any Native American heritage. H.S. indicated she did not. H.S. was not present at the ICWA hearing, but counsel indicated that she never alleged any Native American tribe membership. Appellant was also not present. When asked if he had anything to add, appellant's counsel simply replied, "[n]othing." (Aug. 24, 2023 Tr. at 4.)

{¶ 34} On October 11, 2023, the trial court issued a decision and judgment entry granting FCCS's motion for permanent custody. Initially, the trial court found that B.N., Jr. was not a Native American child for purposes of ICWA. The trial court went on to find that temporary custody of B.N., Jr. was granted to FCCS for 12 or more months of a consecutive 22-month period.

{¶ 35} In considering the best interest of B.N., Jr., the trial court found that he has never been in the care of H.S. or appellant. The evidence demonstrated that B.N., Jr. had a close bond with H.S., appellant, the foster parents, and his sister with whom he was placed. The trial court found that B.N., Jr. was too young to express his wishes. As to B.N., Jr.'s custodial history, the trial court found he was in FCCS's continuous custody since December 9, 2019. The trial court considered B.N., Jr.'s need for a legally secure placement and found that B.N., Jr. needed permanency. Moreover, H.S. and appellant failed to remedy the concerns that led to B.N., Jr.'s removal, and a safety risk to B.N., Jr. existed if he was returned to H.S. and/or appellant. The trial court analyzed the factors outlined in R.C. 2151.414(E)(7) through (11). None of those factors applied to appellant. The trial court determined that clear and convincing evidence demonstrated that granting FCCS's motion for permanent custody was in B.N., Jr.'s best interest.

{¶ 36} It is from that decision that appellant now brings this appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 37} Appellant assigns the following as trial court errors:

> [1.] The lower court plainly erred when it failed to comply with 25 U.S.C. Section 1901 *et. seq.* ("The Indian Child Welfare Act of 1978") (ICWA), 25 C.F.R. Section 23.107 *et. seq.*, and 81 Fed. Reg. 96476 *et. seq.* in the proceedings below as they relate to Father and son, when it failed to ensure the agency complied with its duties under those provisions and the Ohio Administrative Code as they relate to Father and son, and when it failed to require sworn testimony regarding ICWA as it relates to Father and son.

[2.] The lower court's decision to terminate Father's constitutional right to parent his son, BN, Jr., was not supported by clear and convincing evidence and ran against the manifest weight of the evidence.

[3.] The lower court failed to require the GAL to investigate and ascertain BN, Jr.'s wishes pursuant to R.C. 2151.281(D) and Sup. R. 48.03(D) *et. seq.* which undermined the court's R.C. 2151.414(D)(1)(b) best interest factor findings. In addition, the court's determination that BN, Jr. was "too young to express his wishes" was unsupported due to the GAL's testimony that BN, Jr. was in fact able to articulate his wishes. The lower court's actions violated Father's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1 and 16 of the Ohio Constitution.

[4.] The lower court plainly erred by permitting a witness lacking personal knowledge to testify about Father's drug screen/hair follicle test results, and plainly erred by relying on said results in granting the Agency's PCC motion despite the results constituting inadmissible hearsay. The court's actions violated Father's rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution, Article I, Sections 1 and 16 of the Ohio Constitution, Evid. R. 602, 801(C), and 802.

## III.  STANDARD OF REVIEW

{¶ 38} This court has held that failure to timely notify the trial court of a possible error waives all but plain error. *H.C. v. R.C.*, 2016-Ohio-668, ¶ 9 (10th Dist.). "In the civil context, an appellate court only applies the plain error doctrine in 'extremely rare cases' when the asserted error 'seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.' " *Id.*, quoting *Goldfuss v. Davidson*, 1997-Ohio-401, ¶ 24, 30.  In the context of permanent custody proceedings, parental rights determinations are difficult to make, and reviewing courts provide wide latitude to the trial court's findings of evidence. *In re K.S.*, 2025-Ohio-1381, ¶ 24 (10th Dist.).  As such, plain error is particularly difficult to establish in these matters. *In re A.S.*, 2022-Ohio-1861, ¶ 54 (10th Dist.).

{¶ 39} It is well-established that a parent's right to raise a child "is an 'essential' and 'basic civil right.' " *M.S.K. v. C.K.*, 2016-Ohio-5046, ¶ 8 (10th Dist.), quoting *In re Murray*,

52 Ohio St.3d 155, 157 (1990). The "[p]ermanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' " *In re Hoffman*, 2002-Ohio-5368, ¶ 14, quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991). Based upon these principles, the Supreme Court of Ohio has determined that a parent " 'must be afforded every procedural and substantive protection the law allows.' " *In re S.C.*, 2022-Ohio-356, ¶ 34 (10th Dist.), quoting *Smith* at 16. A parent's rights, however, are not absolute. *In re B.L.*, 2005-Ohio-1151, ¶ 7 (10th Dist.). " '[A] parent is afforded a reasonable, not an indefinite, period to remedy the conditions causing the child's removal.' " *In re W.J.T.*, 2019-Ohio-3051, ¶ 41 (12th Dist.), quoting *In re G.W.*, 2019-Ohio-1586, ¶ 53 (12th Dist.) (further citations omitted).

{¶ 40} "In reviewing a judgment granting permanent custody to FCCS, an appellate court 'must make every reasonable presumption in favor of the judgment and the trial court's findings of facts.' " *In re J.T.*, 2012-Ohio-2818, ¶ 8 (10th Dist.), quoting *In re P.G.*, 2012-Ohio-469, ¶ 37 (10th Dist.). An appellate court will not reverse a trial court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence. *In re H.D.*, 2014-Ohio-228, ¶ 8 (10th Dist.). Clear and convincing evidence must "produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established." *In re K.L.*, 2013-Ohio-3499, ¶ 14 (10th Dist.). "It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt." *Id.*

{¶ 41} R.C. 2151.414(B) establishes the analysis that the trial court must apply when ruling on a motion for permanent custody. The trial court must determine whether the following applies: "(d) . . . [t]he child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period." R.C. 2151.414(B)(1)(d). Once the trial court makes that finding, it must determine if granting the motion for permanent custody is in the child's best interest. In making that determination, the trial court is to consider all relevant factors, including, but not limited to, the factors listed in R.C. 2151.414(D)(1)(a) through (e). R.C. 2151.414(D)(1). The factors listed in R.C. 2151.414(D)(1) are a non-exhaustive list and any single factor is not given greater weight than the others. *In re K.C.*, 2024-Ohio-2081, ¶ 46 (10th Dist.).

{¶ 42} Sufficiency of the evidence is a test of adequacy to determine if the evidence is legally sufficient to sustain a decision. This is a question of law to be reviewed de novo by this court. *In re J.V.*, 2012-Ohio-4961, ¶ 3. This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented. *In re K.A.*, 2016-Ohio-7911, ¶ 10 (12th Dist.). However, even if the juvenile court's decision is supported by sufficient evidence, "an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." (Emphasis omitted.) *In re T.P.*, 2016-Ohio-72, ¶ 19 (12th Dist.).

{¶ 43} As with all challenges to the manifest weight of the evidence, in determining whether a juvenile court's decision is against the manifest weight of the evidence in a permanent custody case, an "appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." (Further quotation marks and citation omitted.) *In re K.M.*, 2024-Ohio-2137, ¶ 34 (10th Dist.).

{¶ 44} On appellate review, "[p]ermanent custody motions supported by some competent, credible evidence going to all the essential elements of the case will not be reversed . . . as against the manifest weight of the evidence." *In re Brown*, 2004-Ohio-3314, ¶ 11 (10th Dist.). Further, in determining whether a judgment is against the manifest weight of the evidence, the reviewing court is guided by the presumption that the findings of the trial court are correct. The underlying rationale of giving deference to the findings of the trial court rests with the understanding that the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *In re S.R.*, 2006-Ohio-4983, ¶ 38 (10th Dist.). "In proceedings involving the custody and welfare of children the power of the trial court to exercise discretion is peculiarly important. The knowledge obtained through contact with and observation of the parties and through independent investigation cannot be conveyed to a reviewing court by printed record." (Further quotation marks and citation omitted.) *In re A.H.*, 2021-Ohio-1040, ¶ 30 (10th Dist.).

{¶ 45} Thus, we must look at the entire record to determine whether the trial court had sufficient evidence before it, to clearly and convincingly find that it was in B.N., Jr.'s best interest to terminate the parental rights and award permanent custody to FCCS.

## IV. LEGAL ANALYSIS

{¶ 46} In his first assignment of error, appellant alleges that the trial court committed plain error by failing to comply with the requirements of ICWA and related Ohio Administrative Code ("OAC") sections. More specifically, appellant alleges that the trial court failed to make a proper inquiry as to whether appellant was a Native American child through appellant for purposes of ICWA.

{¶ 47} In 1978, Congress passed ICWA to address the "alarmingly high percentage of Indian families [that] are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies" and to address the placement of an "alarmingly high percentage of such children . . . in non-Indian foster and adoptive homes." 25 U.S.C. 1901(4). The regulations accompanying ICWA state the following:

> State courts must ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child. The inquiry is made at the commencement of the proceeding and all responses should be on the record. State courts must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.

25 C.F.R. 23.107(a).

{¶ 48} Appellant did not raise this issue in the trial court. Thus, we are limited to a plain-error review. *See In re S.M.*, 2025-Ohio-34, ¶ 15 (9th Dist.); *In re K.Y.*, 2025-Ohio-1117, ¶ 35 (5th Dist.); *In re L.T.*, 2025-Ohio-1719, ¶ 15 (5th Dist.). We were recently confronted with this issue in *In re L.W.*, 2025-Ohio-2236 (10th Dist.). In *L.W.*, we were asked to decide whether it was plain error for the trial court to not make an ICWA inquiry during the permanent custody proceedings. Ultimately, we held that because the parent did not allege, either in the trial court or on appeal, that she or L.W. possessed Native American heritage, we could not "find the lack of an ICWA inquiry caused a manifest miscarriage of justice or had a material, adverse effect on the proceedings." *Id.* at ¶ 46. As such, we determined that the appellant failed to establish that the trial court committed plain error. *Id.* at ¶ 44.

{¶ 49} Just like the parent in *L.W.*, appellant has not alleged, either in the trial court or on appeal, that he or B.N., Jr. possess Native American heritage. In fact, this case has a far stronger ICWA record than that in the *L.W.* case. In *L.W.*, there was a complete failure to conduct an ICWA inquiry. *Id.* at ¶ 42, 46. Here, at the initial emergency custody hearing in December 2019, the magistrate asked H.S. if she was a member of a Native American tribe. She replied that she was not. Furthermore, prior to issuing its decision, the trial court conducted a hearing where it asked both H.S.'s counsel and appellant's counsel whether they had any information as to whether the parties were members of a Native American tribe. Neither attorney alleged that the parties or B.N., Jr. had any Native American heritage. Based on the foregoing, we cannot find that this is one of those extremely rare cases where the asserted error seriously affected the basic fairness, integrity, and/or public reputation of the judicial process. As such, the trial court did not plainly error in conducting its ICWA inquiry in the manner that it did.

{¶ 50} Further demonstrating that no manifest miscarriage of justice occurred in this matter is that, based on United States Supreme Court precedent, even if appellant alleged, let alone proved, Native American heritage, ICWA's involuntary termination of parental rights provisions do not apply to him. In *Adoptive Couple v. Baby Girl*, 570 U.S. 637 (2013), the United States Supreme Court observed that 25 U.S.C. 1912(f) conditioned involuntary termination of parental rights on a showing regarding the merits of *continued* custody of the child by the parent. *Id.* at 648. Thus, that section "does not apply in cases where the Indian parent *never* had custody of the Indian child." (Emphasis in original.) *Id.* Here, it is undisputed that B.N., Jr. never resided with or was in the legal custody of appellant. Thus, 25 U.S.C. 1912(f) would not apply to B.N., Jr. through appellant.

{¶ 51} Furthermore, in *Adoptive Couple*, the Supreme Court held that 25 U.S.C. 1912(d) only applied in cases "where an Indian family's 'breakup' would be precipitated by the termination of the parent's rights." *Id.* at 651. Thus, where there was no relationship that would be discontinued, or a Native American family entity that would be ended, by the termination of the Native American parent's rights, 25 U.S.C. 1912(d) does not apply. *Id.* at 651-652. Here, although appellant did not abandon B.N., Jr. and consistently visited with him, a number of factors demonstrate that a Native American family would not be broken up as a result of the termination of appellant's parental rights. Those factors

include: B.N., Jr. has never been in the legal custody of or resided with appellant; appellant and H.S. were never married; appellant has never established paternity of B.N., Jr.; and in the beginning stages of this case, appellant did not engage in case plan objectives because he believed H.S. would work the case plan to reunify with B.N., Jr. As such, 25 U.S.C 1912(d) would not apply to B.N., Jr. through appellant.

{¶ 52} Based on the foregoing, we cannot say that the trial court plainly erred in its ICWA inquiry. Appellant's first assignment of error is overruled. Although we have found no plain error in this matter with regards to ICWA, we would be remiss not to emphasize the importance of strictly complying with the statute's requirements. Failure to do so may lead to disruptions in the child-custody and adoption process. Such disruptions frustrate not only the purpose of ICWA, but also the child-custody process's goal of permanency.

{¶ 53} In his second assignment of error, appellant alleges that the trial court's decision to grant FCCS's motion for permanent custody was not supported by sufficient evidence and ran against the manifest weight of the evidence. More specifically, appellant contends that he substantially remedied the conditions that caused B.N., Jr.'s initial removal and he substantially complied with his case plan. However, these arguments fall under the factor contained in R.C. 2151.414(E)(1), which the trial court is not required to consider during its best-interest analysis. *In re A.M.*, 2025-Ohio-2993, ¶ 27-28 (10th Dist.). Nevertheless, in considering these arguments as other relevant factors in the best-interest analysis, appellant's contentions are belied by the record.

{¶ 54} A review of the record reveals that the trial court's decision was supported by clear and convincing evidence. Initially, it should be noted that the trial court's finding under R.C. 2151.414(B)(1)(d), that B.N., Jr. was in FCCS's custody for 12 or more months of a consecutive 22-month period, is not being challenged. It is also worth noting that despite H.S.'s statement through counsel that she was not contesting the motion for permanent custody, FCCS set forth substantial evidence that termination of H.S.'s parental rights was in B.N., Jr.'s best interest. The evidence at trial demonstrated that despite some encouraging progress by H.S., beginning in October 2022, H.S. stopped having contact with the caseworker; stopped visiting B.N., Jr.; stopped submitting to drug screens; and left her safe and stable housing. Given the developments with regards to H.S. in the year preceding the permanent custody hearing, it was reasonable to assume that she would have to again

complete many of the case plan objectives she previously completed. It follows that FCCS proved by clear and convincing evidence that termination of H.S.'s parental rights was in B.N., Jr.'s best interest.

{¶ 55} As it pertains to appellant, the evidence regarding B.N., Jr.'s interaction and interrelationship with his parents, siblings, relatives, foster caregivers, and out-of-home providers renders this factor, at best, neutral. The record is replete with evidence that B.N., Jr. was bonded with his foster family and referred to his foster parents as mom and dad. Furthermore, he was bonded with his oldest sister who resided in the same foster home. The record also establishes that B.N., Jr. was bonded with appellant. Appellant consistently visited with B.N., Jr. and the behavior during those visits was appropriate. Despite the undeniable bond between the two, the evidence also demonstrated that in over three years, appellant never progressed far enough in his case plan objectives to move from supervised to unsupervised visitations. Except for a brief period when H.S. was having unsupervised home visits with B.N., Jr. (visits appellant was not supposed to be attending), appellant has never had visits with B.N., Jr. outside of FCCS supervision.

{¶ 56} Under R.C. 2151.414(D)(1)(b), the trial court determined that B.N., Jr. was too young to express his wishes. Thus, this factor is inapplicable to the trial court's analysis. We will address appellant's challenge to this finding in our discussion of his third assignment of error.

{¶ 57} Clear and convincing evidence established that B.N., Jr.'s custodial history weighed in favor of granting FCCS's motion for permanent custody. R.C. 2151.414(D)(1)(c). FCCS received custody of B.N., Jr. upon his release from the hospital following his birth. At the time of the hearing, B.N., Jr.'s entire life was spent in FCCS's custody. He never resided with and never was in legal custody of appellant. As previously stated, appellant never progressed to unsupervised visitation.

{¶ 58} The record establishes that B.N., Jr. needed a legally secure placement, and it could not be achieved without a grant of permanent custody to FCCS. At the time of the trial, B.N., Jr. was in the custody of FCCS for his entire life, approximately three and a half years. FCCS exhausted its available extensions of temporary custody attempting to reunify B.N., Jr. with one of his parents. Therefore, the trial court only had three options: place

B.N., Jr. with H.S.; place him with appellant; or grant FCCS's motion for permanent custody.

{¶ 59} Placing B.N., Jr. with H.S. was clearly not an option because she failed to even appear for the permanent custody hearings. Placement with appellant was also not an option. Although exercised consistently, appellant's visitation never progressed beyond supervised visits. Despite being on the case plan since 2020, appellant failed to obtain a domestic violence assessment until right before the permanent custody proceedings began. Even after he completed the assessment, he was removed from the recommended classes due to non-attendance. Appellant tested positive in April 2022 for methamphetamine and cocaine, more than six months after FCCS filed for permanent custody. He also failed to provide documentation of a stable and legal income.

{¶ 60} Based on a review of the record, clear and convincing evidence also established that appellant did not obtain stable housing. Although there was arguably an appropriate room for B.N., Jr. on the first floor of the home, the evidence in total presented a murky picture as to appellant's living situation. The testimony conflicted as to whether B.N., Jr. would stay in the basement or in the room on the first floor. It was unclear who else was staying at the residence. In fact, a random person seemed to be residing in the basement with appellant when Waldeck visited the home. V.T. and her medical equipment took up the entire living room, which could pose a risk both to her and B.N., Jr. Appellant did not have a lease, which is especially concerning because the home appeared to be owned or rented by a person with significant medical issues. Furthermore, appellant testified that he was in the process of finding new housing, demonstrating that his current situation was temporary in nature.

{¶ 61} On the other hand, B.N., Jr. resided in a potentially adoptive foster home since June 2021. He was bonded with his foster parents, and all his needs were being met. His oldest sister also resided in the foster home.

{¶ 62} Based on the foregoing, the trial court's only option was to grant FCCS's motion for permanent custody. In the more than three years leading up to the permanent custody hearing, neither parent made sufficient progress on their case plans. At the time of the trial, B.N., Jr. could not be placed with either parent, whereas granting FCCS's motion for permanent custody established permanency with the potential that he would be adopted

into his current foster home. Thus, based on a review of the factors contained in R.C. 2151.414(D)(1)(a) through (d), FCCS established by clear and convincing evidence that permanent custody was in B.N., Jr.'s best interest.

{¶ 63} Appellant's main argument in support of his allegation that he substantially remedied the conditions that caused B.N., Jr.'s removal from the home is that the initial complaint in this matter only briefly references appellant. However, were we to accept this argument, it would mean that permanent custody could not be granted regardless of what concerns arise following the filing of a complaint, so long as that complaint is silent regarding those concerns. This cannot be so. The removal of a child from the home continues if the child is not in the parent's custody. Indeed, public children's services agencies are required to demonstrate that they have made "reasonable efforts" to prevent the removal or *continued removal* of children from their homes. R.C. 2151.419(A)(1). As such, a review of whether a parent has substantially remedied the conditions causing removal is not limited to the initial removal of the child, but also the conditions that caused the continued removal of the child.

{¶ 64} The record shows that appellant did not substantially remedy the concerns causing B.N., Jr.'s removal. At the time of the trial, appellant did not have stable housing; was removed from domestic violence counseling due to non-attendance; and failed to provide documentation regarding his income. Although he obtained two alcohol and drug assessments, he never provided the caseworker with sufficient documentation to show he successfully completed the recommendations. Furthermore, he tested positive for methamphetamine and cocaine as recently as April 2022. All of this evidence taken together demonstrates that appellant failed to substantially remedy the conditions causing B.N., Jr.'s removal.

{¶ 65} As for appellant's contention that he substantially complied with his case plan, it is refuted by the record. It took appellant nearly three and a half years to complete a domestic violence assessment. He was then removed from the recommended counseling due to non-attendance. Although he completed his parenting class, he removed himself from the subsequent parent mentoring program due to non-compliance. Despite engaging in drug treatment and routinely submitting to screens, his hair follicle test was positive for methamphetamine and cocaine more than six months after FCCS filed its motion for

permanent custody. Furthermore, the caseworker testified appellant never provided documentation demonstrating he successfully completed drug treatment.

{¶ 66} Even considering the objectives appellant did complete, of concern is the seemingly cavalier attitude he maintained throughout this process. Appellant initially did not engage in case plan services because he believed H.S. would do what it took to complete reunification with B.N., Jr. He did not complete domestic violence counseling because he believed it to be unnecessary. He testified that he learned nothing from his parenting classes. He testified that he did not take his drug addiction diagnoses seriously and denied that he had a drug problem. A review of the record reveals that he never took accountability for any of the conditions that caused B.N., Jr.'s removal. According to him, the domestic violence allegations were lies, and he never knowingly used methamphetamine or cocaine. Even his decision to lie about living with H.S. was H.S.'s fault. This failure to take the process seriously was also demonstrated by appellant's repeated, unsolicited, and vulgar comments throughout the permanent custody hearing. Although this behavior is certainly not dispositive of a permanent custody motion, appellant's lack of accountability and failure to take case plan services seriously cast doubt on his ability to achieve permanency for B.N., Jr. without granting FCCS's motion for permanent custody.

{¶ 67} Based on the foregoing, the trial court's decision granting FCCS's motion for permanent custody was supported by sufficient evidence and was not against the manifest weight of the evidence. Appellant's second assignment of error is overruled.

{¶ 68} In his third assignment of error, appellant contends that the trial court erred in finding that B.N., Jr. was too young to express his wishes and in failing to require Waldeck to adequately investigate the child's wishes. Appellant's argument focuses on Waldeck's testimony that B.N., Jr. could express his wishes, as well as case law indicating a child does not need to understand the ramifications of permanent custody for those wishes to be considered. Because this issue was not raised in the trial court, we are limited to plain-error review.

{¶ 69} This court has reversed permanent custody decisions due to a trial court's failure to consider the wishes of the child. *In re Williams*, 2001 Ohio App. LEXIS 1247, *910 (10th Dist. Mar. 20, 2001); *In re Swisher*, 2003-Ohio-5446, ¶ 50 (10th Dist.). However, subsequent decisions have frequently distinguished these cases based on their

specific facts. For example, in *In re C.M.*, 2008-Ohio-2977, ¶ 63 (10th Dist.), we noted that unlike in *Williams*, wherein the child was 7 years old, C.M. and M.M. were 3 years old and 2 years old, respectively. Furthermore, the case in *C.M.* was distinguishable from *Williams* because the GAL testified and filed a report prior to the hearing. *Id.* at 62, 64. Similarly, in this matter, B.N., Jr. was only 3 years old at the time of the hearing; the GAL filed numerous reports prior to the hearings; and the GAL testified. As such, the facts of this case are distinguishable from cases in which we have reversed due to the trial court's failure to ascertain the child's wishes.

{¶ 70} In short, a review of the case law demonstrates that the resolution of this issue is achieved by a case-specific, fact-based inquiry. Here, B.N, Jr. was three years old at the time of the hearing. Testimony established that although he did not have any delays, he was not sufficiently verbal to engage in counseling. Even appellant testified that B.N., Jr. was confused by the situation and was just beginning to talk. (June 15, 2023 Tr. at 96.) Waldeck testified at the hearing that B.N., Jr. was bonded with his foster family, which included his oldest sister, and appeared to be happy in his placement. *See In re Salsgiver*, 2003-Ohio-6412, ¶ 27 (11th Dist.) (finding that the trial court did not fail to consider the child's wishes where the court found the child was unable to express her wishes and the GAL recommended that permanent custody was in the child's best interest).

{¶ 71} Furthermore, Waldeck filed numerous reports prior to the commencement of the permanent custody proceedings. Many of these reports stated that B.N., Jr. was unable to understand the concept of permanence. Although appellant points to case law stating that a child need not understand the process of permanent custody for the court to consider the child's wishes, the concept of permanence is not necessarily the same as the permanent custody process and its ramifications. Although permanency is the ultimate goal of that process, an understanding of permanency is also at the very heart of what weight to assign a child's wishes.

{¶ 72} Based on the record in this matter, we cannot say that the trial court plainly erred in its findings regarding the wishes of the child. *See In re K.P.*, 2022-Ohio-1347, ¶ 37-46 (12th Dist.) (although the issue was not raised on appeal, any lack of evidence regarding the child's wishes was negated by the facts of the case, namely the child had been in custody

since he was four days old and no longer qualified for temporary custody). Appellant's third assignment of error is overruled.

{¶ 73} Appellant's final assignment of error alleges that the trial court plainly erred in allowing the caseworker to testify regarding drug screen results. Assuming, arguendo, that the trial court erred in permitting this testimony, this is not one of the extremely rare cases that calls into question the fairness and/or integrity of the judicial process. Although denying that he used certain narcotics, appellant acknowledged in his testimony that several of his drug screens were positive. Moreover, the caseworker testified that his drug screens that were only positive for marijuana and suboxone, were considered positive, but were not held against him due to his prescriptions. Even if we were to completely ignore the drug screen results, the remaining evidence overwhelmingly supported the trial court's decision. As mentioned above, at the time of the hearing, appellant never completed domestic violence counseling; did not have stable housing; did not provide documentation regarding his income; and never progressed beyond supervised visitation with B.N., Jr. In short, the caseworker's testimony regarding appellant's drug screen results did not have a meaningful impact on the outcome of the case.

{¶ 74} Based on the foregoing, appellant's fourth assignment of error is overruled.

## V. CONCLUSION

{¶ 75} Having overruled each of appellant's four assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch.

*Judgment affirmed.*

BOGGS, P.J., and DINGUS, J., concur.

_____